Filed 4/24/08                     NO. 4-07-0344

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

<table>
<tr><td>THE ILLINOIS DEPARTMENT OF CENTRAL<br>MANAGEMENT SERVICES (STATE POLICE),<br>     Petitioner-Appellant,<br>     v.<br>THE ILLINOIS LABOR RELATIONS BOARD,<br>STATE PANEL; JACKIE GALLAGHER, MICHAEL<br>HADE, CHARLES HERNANDEZ, REX PIPER, and<br>MICHAEL COLI, the Members of Said Board and<br>Panel in Their Official Capacity Only; and the<br>AMERICAN FEDERATION OF STATE, COUNTY<br>AND MUNICIPAL EMPLOYEES, COUNCIL 31,<br>     Respondents-Appellees.</td><td>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)</td><td>Petition for Review of an<br>Order of the Illinois Labor<br>Relations Board, State<br>Panel<br><br><br>No. S-RC-04-108</td></tr>
</table>

PRESIDING JUSTICE APPLETON delivered the opinion of the court:

Pursuant to section 9(a-5) of the Illinois Public Labor Relations Act (Act) (5 ILCS 315/9(a-5) (West 2006)), the American Federation of State, County and Municipal Employees, Council 31 (union), filed a petition to represent telecommunications supervisors, employed by the State of Illinois, Department of Central Management Services, State Police (employer). The employer opposed the petition on the grounds that telecommunications supervisors were "supervisors" within the meaning of section 3(r) (5 ILCS 315/3(r) (West 2006)), "managerial employees" within the meaning of section 3(j) (5 ILCS 315/3(j) (West 2006)), or both. The Board found that telecommunications supervisors were neither "supervisors" nor "managerial employees" and, therefore, ordered their inclusion in the RC-14 bargaining unit. American Federation of State, County & Municipal Employees, Council 31, 23 Pub. Employee Rep. (Ill.) par. 38,

at 98, No. S–RC–04–108 (Illinois Labor Relations Board, State Panel, March 19, 2007) (2007 PERI (LRP) LEXIS 37 at *7-8) (hereinafter 23 Pub. Employee Rep. (Ill.) par. 38). The employer appeals, contending only that telecommunications supervisors are "supervisors" and, as such, are ineligible for inclusion in the bargaining unit. See 5 ILCS 315/3(s)(1) (West 2006).

The Board could reasonably find that the employer failed to prove two propositions: (1) the principal work of telecommunications supervisors is substantially different from that of lead call-taker, and (2) telecommunications supervisors perform a supervisory function. See 5 ILCS 315/3(r) (West 2006). With those propositions unproved, telecommunications supervisors are not "supervisors" in the statutory sense. Therefore, we affirm the Board's decision.

## I. BACKGROUND

### A. The Communications Service Bureau

Throughout the state, the Illinois State Police has 19 call centers, which receive emergency telephone calls from the public and provide dispatching services for troopers. The call centers are part of the Communications Service Bureau of the Division of Administration. At the helm of the bureau is the bureau chief, and beneath the bureau chief are two assistant bureau chiefs. The State of Illinois is divided into four regions, and each assistant bureau chief is responsible for two of the regions. Each region has a regional manager, who reports to the assistant bureau chief. The Northern Region has eight call centers. The Southern Region has 11. Each call center has a telecommunications supervisor, who reports to the regional manager. Beneath the

telecommunications supervisor, in descending order of hierarchy, are the lead call-takers and the call-takers.

## B. The Duties of a Call-Taker

According to a "class specification" (or job description) written by CMS, the "[d]istinguishing [f]eatures" of a call-taker's work are as follows:

"Under general supervision of a telecommunications supervisor, [a call-taker] answers and responds to incoming requests for service via telephone or in person; assigns [Illinois State Police] officers to respond to calls; transmits and receives law[-]enforcement messages and data by two-way radio and computer systems; monitors and/or provides base[-]station service for multiple police priority and business channels; processes confidential information; [and] originates, relays[,] and interprets information relating to the safety and well-being of law[-]enforcement officers and citizens."  Board exhibit No. 5.

Call-takers each "[o]perate[] a personal[-]computer terminal," and when they receive information over the radio or telephone, they enter it into various databases in the Law Enforcement Agencies Data System (LEADS)--for example, membership in gangs and the residential address of sex offenders.  They also "provide[] training for trainees[,] as directed."

## C. Duties of a Lead Call-Taker

- 3 -

According to CMS's class specification, the work of a "telecommunicator lead call[-]taker" has the following "[d]istinguishing [f]eatures":

"Under general supervision[,] [a lead call-taker] acts as a lead worker overseeing the activities of telecommunicators, typically on a busy shift when the supervisor is absent; assists [the] supervisor in preparing technical reports and maintains [LEADS] records; provides input into employee performance evaluations; assists lower[-]level telecommunicators, [t]elecommunicator/[c]all[-][t]akers[,] and local [l]aw[-][e]nforcement agencies in the resolution of two-way radio and computer[-]terminal operational problems; processes confidential material; also functions as a [t]elecommunicator [c]all[-][t]aker; answers and responds to incoming requests for service from the public via telephone or in person; assigns [Illinois State Police] officers to respond to calls; transmits and receives law[-]enforcement messages and data by two-way radio, teletype, and computer[-]terminal equipment; monitors and/or provides base[-]station services for multiple police priority and business channels; [and] originates, relays[,] and interprets information relating to the safety and

- 4 -

well[-]being of law[-]enforcement officers and citizens."

Under the heading "Illustrative Examples of Work," the class specification says that lead call-takers perform the following tasks, among others:

"3. Assists [the] supervisor in the preparation of reports, provides input into employee performance evaluations; when [the] supervisor is absent, authorizes over[]time assignments in accordance with contract protocols, carries out on the-the-job training programs for new staff and may assume the lead position in such training; [and] recommends, monitors, and ensures compliance with operational policies and rules."  Board exhibit No. 5.

Bonnie C. Lane, the assistant bureau chief for the Southern Region, testified as follows:

"[The position of lead call-taker] is a quasi-supervisory position[] in that they provide shift or floor oversight.  Obviously, a [t]elecommunications [s]upervisor can't work 24 hours a day and isn't able to be there across all three shifts.

So the [l]ead [c]all[-][t]aker is there to *** monitor, again, operational compliance, the integrity of operations. They're responsible, over the course of the year, the evaluation period, to assist in gathering some *** front-line

- 5 -

data, in terms of operational compliance, quality, [and] professionalism.

They're looked to[,] most times[,] as being a little better versed, maybe, in some of the technical issues. With the computer-aided dispatch, they might be the go-to person for questions on entry or data management.

But, basically, they are a way to assist the supervisors with compliance issues on shifts *** that aren't during the traditional work hours.

Some centers have one [l]ead [c]all[-][t]aker, some have two. Due to staffing vacancies that can't be filled at this time, we do have some centers that have no [l]ead [c]all[-][t]akers presently on staff.

But they are, basically, there to just assist with gathering documentation and monitoring operations." Board exhibit No. 5.

D. The Duties of a Telecommunications Supervisor

1. The Class Specification

According to the class specification, the "[d]istinguishing [f]eatures" of the work of a telecommunications supervisor are as follows:

"Under general direction, [the telecommunications supervisor] plans, directs, and evaluates the operations of a

- 6 -

telecommunications center; supervises a staff of telecommunicators providing computer[-]assisted law[-]enforcement radio[-]dispatching and call[-]taking to state and local agencies; trains, schedules[,] and evaluates the performance of [t]elecommunicators in a law[-]enforcement district office through subordinate lead workers, overseeing a continuous multi-shift operation[]; maintains personnel and operational files[] [and] office inventory control; administers operations dispatching and telecommunications service contracts with various state and local agencies; [and] prepares operating reports."  Board exhibit No. 5.

Here are some "illustrative examples" of what a telecommunications supervisor does:

"1. Plans, supervises[,] and coordinates a State Police [d]istrict [t]elecommunications [c]enter, providing computer[-]assisted radio dispatching services for law[-]enforcement personnel; schedules approximately nine telecommunications personnel on multiple shifts[;] maintains personnel and operational files[;] [and] prepares associated records and reports[,] utilizing word processing, spreadsheet[,] and database software applications.

2. Administers procedural policies; monitors compliance with standard operating procedures; provides corrective training where necessary to maintain operational standards and station efficiency; operates [a] console [10] hours per month to maintain operational efficiency; takes supervisory and managerial training; [and] serves as a member of the hiring selection interview team.

3. Administers the [t]elecommunicator [t]raining [p]rogram at the district level, providing on-the-job training of new employees; reviews employee performance on a continuing basis and prepares and signs periodic employee performance evaluations; [and] promotes or terminates trainees, as appropriate.

* * *

10. Administers the collective[-]bargaining contract[,] conducts labor/management meetings[,] prepares local formal labor/management agreements[,] and processes and adjusts first[-]level grievances.

***

12. Schedules operational personnel according to the needs of the Illinois State Police and other state agencies with whom formal dispatch agreements exist; monitors

operations to ensure compliance with existent guidelines, contracts[,] and agreements."  Board exhibit No. 5.

### 2. The Duties and Authority of a Telecommunications Supervisor, as Described in the Testimony

#### a. Monitoring the Operation of the Call Center

In the administrative hearing, the employer called two assistant bureau chiefs, Kay Rubin, who was responsible for Regions I and II in the northern part of the state, and Bonnie C. Lane, who was responsible for Regions III and IV in the southern part of the state, and two telecommunications supervisors, Chrystal J. Mitchell from District 19 in Carmi and Sherri J. Mahon from District 12 in Effingham.  The union called two telecommunications supervisors, Tracy A. Vail from District 14 in Macomb and Karen M. Stec from the Chicago district.

Lane testified that a telecommunications supervisor was "the managerial presence, the supervisory presence[,] for the operations of [the call] center [24 hours a day and 7 days a week]."  Before becoming an assistant bureau chief, Lane was a regional manager.  During her 2 1/2-year stint as a regional manager, she visited each call center in her region "maybe four times a year" but communicated with the telecommunications supervisors every week.  She testified that the "general practice" was to put the lead call-taker in "a shift, either in part or whole, opposite[] [to the shift of the telecommunications supervisor], so that would mean, primarily, evenings or midnight shift."

Mitchell and Mahon both testified they had infrequent contact with their regional manager.  The administrative hearing occurred in January 2006, and, since

- 9 -

April 2005, the regional manager had visited Mitchell's call center only once. Mitchell testified she had "spoken to [the regional manager] twice on the telephone" (whether Mitchell meant since April 2005 or during the seven years Mitchell had been a telecommunications supervisor is unclear). Mahon testified that during the five years she had been a telecommunications supervisor, her regional manager had visited her call center once. "I don't know that I have ever talked to her on the phone, maybe once or twice; and, I mean, I e[]mail her every once in a while[,] but mostly to ask for time off for myself. But other than that, [I have no contact with the regional manager] at all."

Telecommunications supervisors typically carry a pager or cellular telephone so that the call center can reach them at any time. During their shifts, they sit by the consoles or listen to a radio scanner in their office, making sure the call-takers are following procedures and handling calls with courtesy and competence.

### b. Scheduling

The telecommunications supervisor prepares a "base schedule," in which he or she determines what the shifts will be and how many employees will be needed in each shift. The subordinate employees then bid on shifts, which are awarded on the basis of seniority. Different telecommunications supervisors have different scheduling practices. Mitchell testified: "I normally like to make two schedules that are workable for my district. I let [the employees] vote on which one they approve, and then they bid on those slots, and it's submitted to the [u]nion." As for Stec, she testified she had "never created a schedule. We have certain time slots that need to be filled, and it's just

a given.  *** [W]here the scheduling comes into effect is during vacation times[;] you have to make sure you have the coverage.  Most of the time[,] it results in overtime."

By "coverage," Stec meant the minimum staffing level.  For her call center in the Chicago district, it was 5 people on the day shift, 4 1/2 people on the evening shift ("1/2" meaning the first half of the shift had an additional person), and 4 people on the midnight shift.  Stec testified that the telecommunications supervisors in the Chicago district had recommended this minimum staffing level and the assistant bureau chief had approved the recommendation.  (Later, because of staff shortages, the telecommunications supervisors of the Chicago district requested a lower minimum staffing level, but headquarters balked.)

If an employee called in sick, it usually was necessary to call in someone to perform overtime.  Call centers had a certain percentage of "indeterminates" on their staff--call-takers who could be assigned to any shift--but they had to be given 24 hours' notice.  "Special details" with larger-than-usual deployments of troopers also necessitated overtime.  Some telecommunications supervisors preferred authorizing overtime themselves; other telecommunications supervisors left this task to lead call-takers.  Mitchell testified she "might go back out to work and actually do the overtime callout [herself].  If not, [she would] assign the lead worker or usually the most senior [t]elecommunicator to make the call."  Mahon testified that only if she could not be reached would the lead call-taker call in someone to perform overtime.  Vail testified that "if the overtime needed to be filled and [Vail was] not [at the call center], *** they [did not] have to call [her] before they scheduled the overtime"; "that's what lead workers [were] for."  Stec testified that any call-taker could call someone in for overtime

without obtaining her prior approval. She did not "grant" overtime; "[i]f [they fell] below the staffing levels, then overtime [was] necessary." Rubin testified that the call centers in the Chicago district were so short-staffed that to keep from "getting called 24 hours a day, nonstop, *** to fill overtime," the two telecommunications supervisors in that district had told the call-takers that "if we go below, you know, what they have set as basically what they need to operate, then they have the authority to call people out for overtime or order them, if need be, if we can't reach anybody at home."

Vacation time and overtime were allocated according to seniority. Stec testified: "Everybody submits three vacation requests[,] and [the requests are] granted one at a time by seniority. The first person in seniority ultimately gets their first choice, then down through the line ***." Vail testified that a similar methodology applied to overtime: "You would offer it out to everyone in the order of the most senior[] with the least overtime first. If everybody refuses it, you go to the assignment list, and it's the least senior[] with the least amount of hours[] will get the assignment."

c. The Assignment of Work

Mitchell testified: "We enter a lot of warrants, orders of protection, registered sex[-]offender add-ons, [and] the annual registered sex[-]offender address checks. The troopers go knock on their door[] [and] check to see where they live. We have to do an add-on on each one of those files. We have about 150 of them. And I assign [c]all[-][t]akers to handle these updates." She might split the assignments evenly, or she might give the assignments to whoever was the quickest and most

- 12 -

accurate at entering data into the computer. Mahon testified she might give such assignments to the call-taker on the least-busy console.

Stec explained that "[a]n add-on [was] a note that[] [was] added onto an existing LEADS record"--for example, orders of protection or membership in a gang. According to her, she never assigned add-ons. The information for the add-on typically arrived at the call center via a radio transmission, and "[t]he telecommunicator handling the radio traffic" was always the one who entered the add-on into the computer.

### d. Proof Status

Under section 15(A) of article XXXIII of the collective-bargaining agreement, a telecommunications supervisor may place an employee on proof status "if reasonable grounds exist to suspect abuse." "Proof status" means that the employee must provide written medical certification of the need for sick time. Section 15(B) provides: "At the time an employee is placed on proof status, the Employer will submit to the employee, in writing, the reasons for placing the employee on proof status." Mitchell testified she had placed two employees on proof status without prior approval from her superiors.

### e. Training

A telecommunications supervisor is responsible for training everyone in the call center. Typically, the telecommunications supervisor assigns some or all of the training of new employees to the lead call-taker or an experienced call-taker. The Communications Service Bureau has a 10-month training curriculum consisting of 42 phases. Trainees are tested after each phase and must score 85% or higher. They also

must pass a final examination and be certified within a year.  The telecommunications supervisor monitors the progress of training and, with input from the lead call-taker or whoever is assisting with training, completes a weekly training evaluation on each new probationary employee.

Mitchell testified:  "I keep very thorough documentation, and I have had to[,] in the past[,] suggest that they not be certified, and we have [had] to let them go."  Mahon testified that after conferring with the lead call-taker, she, too, had recommended the firing of a trainee and the acting regional manager had approved Mahon's recommendation.

### f. Performance Evaluations

At least once a year, telecommunications supervisors complete a performance evaluation of each of their subordinates.  Vail admitted that performance evaluations could affect promotions and even continued employment.  "But you also," she testified, "have to follow the guidelines of the contract ***.  *** [H]ypothetically, you've got two people that are applying for the lead worker position[,] and, usually, you have to go to the most senior of those people."  She testified to her own experience of the power that seniority wielded in promotions:  "when I was promoted to supervisor, the lead worker position came open, and I had a transfer that came in, and I had three people [who] wanted the position; but because *** I had to follow the guidelines in the contract, because of her seniority, she was automatically made the lead worker."  Mitchell likewise testified, "[s]eniority plays a huge part in [promotions].  The most senior person has a lot of *** weight," and to promote a less-senior person, the employer

has to prove, through performance evaluations, that the less-senior person is "considerably more qualified for the position."

According to Mitchell, her superiors never told her whether to give an employee a good or bad performance evaluation. While a performance evaluation was "still in the planning process," the regional manager sometimes "g[a]ve [her] better word choices" but never asked her to "change any of the ratings or anything." The regional manager might have told her, "'Well, your rating and your comments don't match, so you need to make them match,'" but that was "all [she had] ever been told."

g. Discipline

Mitchell testified that she once recommended that one of her subordinates receive a written reprimand for late arrival. The assistant bureau chief followed her recommendation.

Mahon "assume[d]" that to impose discipline, she "would need to do an investigation and forward a recommendation *** for some type of discipline." As of yet, she had never had occasion to request discipline for any of her subordinates.

The union's attorney asked Vail:

"Q. Have you ever had to discipline somebody?

A. Yes.

Q. Okay. And can you take me through a little bit of

that process?"

Vail answered "[i]t was an incident involving one of the telecommunicators who had gotten in some trouble after hours." Vail "had to do an investigation on it[] and then

send it up the chain of command."  She recommended a letter of reprimand, but headquarters declined to follow her recommendation and instead suspended the employee for a day.  She had no power to give a written reprimand without her superiors' approval, and, of course, she could not overrule the discipline they imposed.

Stec testified she lacked authority to impose any discipline.  Like Vail, she once recommended a letter of reprimand, but higher-ranking officials ended up giving the employee a more severe form of discipline.

E. The ALJ's Recommended Decision and the Board's Decision

The ALJ found that telecommunications supervisors were not "managerial employees" within the meaning of section 3(j) of the Act (5 ILCS 315/3(j) (West 2006)).  She also found that telecommunications supervisors did not exercise supervisory authority to hire, promote, reward, and adjust grievances (see 5 ILCS 315/3(r) (West 2006)).  Nevertheless, she found that telecommunications supervisors were "supervisors" for the following reasons:  (1) the principal work of a telecommunications supervisor was substantially different from that of a call-taker or lead call-taker; (2) by overseeing the call center, establishing work schedules, assigning work, requiring overtime, granting leave requests, placing employees on proof status, training employees, and evaluating their work performance, telecommunications supervisors exercised supervisory authority to direct employees; (3) telecommunications supervisors exercised supervisory authority to discipline employees; (4) telecommunications supervisors exercised independent judgment and discretion when they directed and disciplined employees; and (5) telecommunications supervisors devoted a

preponderance of their time to supervisory activities.  See 5 ILCS 315/3(r) (West 2006).

The union filed exceptions to these findings.  The employer filed no exceptions.

The Board issued a decision disagreeing with the ALJ's conclusion that telecommunications supervisors were "supervisors" within the meaning of section 3(r). The Board said:

> "Herein, the ALJ's finding that the petitioned-for
> employees are excluded as supervisors turns on her finding
> that they have day-to-day oversight accompanied by the
> authority to issue discipline.  Our review of the hearing
> transcript and the rest of the record leads us to find
> otherwise.  There was no evidence that the written
> reprimands authored by the employees at issue, and placed
> in their subordinates' personnel files, affected their
> employment[;] nor [was there any] evidence that such
> reprimands were subsequently used to enhance later
> discipline.  In short, on this record, the petitioned-for
> employees lack significant discretionary authority to affect
> their subordinates' employment.  Although the petitioned-for
> employees oversee their subordinates' work activities[] and
> provide them with instruction and assistance, they are
> unable to affect the terms and conditions of their
> employment, and oversight authority alone is insufficient to
> constitute supervisory direction under the Act.  [Citations.]

- 17 -

In sum, we find that the employees at issue are not supervisors within the meaning of the Act, as their day-to-day oversight of their subordinates is accompanied[,] at most, only by the authority to issue very low[-]level discipline[] and[,] thus, it is inadequate to qualify as supervisory direction within the meaning of the Act. Consequently, the petitioned-for employees fail to meet the preponderance requirement[] [citations] and[,] therefore, are not supervisory within the meaning of [s]ection 3(r) of the Act and[,] accordingly, not excluded from the Act's coverage under [s]ection 3(s)." 23 Pub. Employee Rep. (Ill.) par. 38, at 98 (2007 PERI (LRP) LEXIS 37, at *6-7).

The Board ordered its executive director to certify the union as the exclusive representative of telecommunications supervisors, who were to be included in bargaining unit RC-14.

This appeal followed.

## II. ANALYSIS

### A. Standards of Review

The Administrative Review Law (735 ILCS 5/3-101 to 3-113 (West 2006)) governs our review of the Board's decision. 5 ILCS 315/11(e) (West 2006). According to section 3-110 of the Administrative Review Law, our "hearing and determination" of this

action "shall extend to all questions of law and fact presented by the entire record before [us]." 735 ILCS 5/3-110 (West 2006).

Our standard of review depends on whether the question is one of fact, one of law, or a mixed question of fact and law. American Federation of State, County & Municipal Employees, Council 31 v. Illinois State Labor Relations Board, 216 Ill. 2d 569, 577, 839 N.E.2d 479, 485 (2005) (AFSCME Council 31). If the question is purely one of fact, we will deem the Board's decision to be "prima facie true and correct." 735 ILCS 5/3-110 (West 2006). Case law has interpreted the phrase "prima facie true and correct" as meaning we will uphold the agency's factual findings and conclusions to the extent they are not "against the manifest weight of the evidence" (AFSCME Council 31, 216 Ill. 2d at 577, 839 N.E.2d at 485), that is, to the extent that the opposite factual findings and conclusions are not "clearly evident" from the evidence in the record (Roti v. LTD Commodities, 355 Ill. App. 3d 1039, 1051, 823 N.E.2d 636, 645 (2005)). If the question is purely one of law, our standard of review is de novo. McKee v. Board of Trustees of the Champaign Police Pension Fund, 367 Ill. App. 3d 538, 543, 855 N.E.2d 571, 575 (2006). "Mixed questions of fact and law are 'questions in which the historical facts are admitted or established, the rule of law is undisputed, and the issue is whether the facts satisfy the statutory standard, or[,] to put it another way, whether the rule of law[,] as applied to the established facts[,] is or is not violated.'" AFSCME Council 31, 216 Ill. 2d at 577, 839 N.E.2d at 485, quoting Pullman-Standard v. Swint, 456 U.S. 273, 289 n.19, 72 L. Ed. 2d 66, 80 n.19, 102 S. Ct. 1781, 1790 n.19 (1982). We will uphold the Board's determination of a mixed question of law and fact unless the determination is "clearly erroneous" (AFSCME Council 31, 216 Ill. 2d at 577, 839 N.E.2d at 485), or only if we are

"left with the firm and definite conviction that a mistake has been committed" (AFSCME Council 31, 216 Ill. 2d at 578, 839 N.E.2d at 485).

B. The Statutory Definition of "Supervisor"

A bargaining unit may not include both employees and supervisors. 5 ILCS 315/3(s)(1) (West 2006). "The purpose of such an exclusion is to ensure that 'pro-union bias will not impair the supervisor's ability to apply the employer's policies to subordinates according to the employer's best interests.'" Chief Judge of the Circuit Court v. American Federation of State, County & Municipal Employees, Council 31, 153 Ill. 2d 508, 515, 607 N.E.2d 182, 186 (1992), quoting City of Freeport v. Illinois State Labor Relations Board, 135 Ill. 2d 499, 506, 554 N.E.2d 155, 159 (1990). The employer in this case maintains that telecommunications supervisors are "supervisors" and that by ordering their inclusion in the bargaining unit, the Board violated section 3(s)(1) of the Act (5 ILCS 315/3(s)(1) (West 2006)).

Section 3(r) defines "supervisor" as follows:

"'Supervisor' is an employee whose principal work is substantially different from that of his or her subordinates and who has authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, direct, reward, or discipline employees[;] to adjust their grievances[;] or to effectively recommend any of those actions, if the exercise of that authority is not of a merely routine or clerical nature[] but requires the consistent use of

- 20 -

independent judgment.  Except with respect to police employment, the term 'supervisor' includes only those individuals who devote a preponderance of their employment time to exercising that authority, [s]tate supervisors notwithstanding."  5 ILCS 315/3(r) (West 2006).

As the party seeking to exclude telecommunications supervisors from the bargaining unit, the employer had the burden of proving, by a preponderance of the evidence, that they were "supervisors."  See Chief Judge of the Circuit Court, 19 Pub. Employee Rep. (Ill.) par. 123, at 487-88, No. S--RC--02--083 (Illinois Labor Relations Board, State Panel, June 27, 2003) (2003 PERI (LRP) LEXIS 121) (hereinafter 19 Pub. Employee Ref. (Ill.) par. 123).  To carry that burden of proof, the employer had to prove each of the following four propositions derived from section 3(r).  First, the principal work of telecommunications supervisors was substantially different from the principal work of their subordinates.  Second, telecommunications supervisors had authority to perform one or more of the 11 supervisory functions listed in section 3(r).  Third, telecommunications supervisors consistently used independent judgment in performing one or more of the supervisory functions.  Fourth, telecommunications supervisors devoted a preponderance of their time to performing one or more of the supervisory functions.  See Chief Judge, 153 Ill. 2d at 515, 607 N.E.2d at 186.  We will consider those four propositions in turn.

### 1. Is the Principal Work of a Telecommunications Supervisor Substantially Different From That of His or Her Subordinates?

#### a. Is This Question Even in Dispute?

The ALJ found that "the principal work of [t]elecommunications [s]upervisors was obviously and visibly different from that of their subordinates[,] notwithstanding the fact that supervisors [might] relieve [c]all[-][t]akers and [l]ead [c]all[-][t]akers when they [took] breaks and [might] also perform [l]ead [c]all[-][t]aker duties when the latter [were] absent." The employer reasons that because the Board, in its decision, did not explicitly disagree with that finding by the ALJ, the finding "is not in dispute and, therefore, the [t]elecommunications [s]upervisors meet the first prong of the supervisory analysis."

The employer's reasoning is unsound in this respect. Just because the Board, in its decision, did not dispute the ALJ's finding that the principal work of telecommunications supervisors was obviously and visibly different from that of call-takers and lead call-takers, it does not logically follow that a different party, the union, agrees with that finding. In fact, in its exceptions to the ALJ's recommended decision and order, the union took issue with that finding--and, in its brief, the union continues to do so.

Moreover, we can affirm the Board's decision for any reason the record discloses, regardless of whether the Board relied on that reason. See <u>Gardziella v. City of Chicago</u>, 337 Ill. App. 3d 181, 185, 785 N.E.2d 81, 85 (2003); <u>Commonwealth Edison Co. v. Illinois Commerce Comm'n</u>, 295 Ill. App. 3d 311, 319, 692 N.E.2d 1350, 1355 (1998). The ultimate correctness of the Board's decision does not depend on the exhaustiveness of the Board's rationale therein.

b. Is the Principal Work of a Telecommunications Supervisor
"Obviously and Visibly Different" From That of His or Her Subordinates?

In its published decisions, the Board has developed a methodology for the principal-work requirement. The Board first asks whether the principal work of the alleged supervisors is "obviously and visibly different" from the principal work of their subordinates. Metropolitan Alliance of Police, Burr Ridge Command Chapter No. 13, 23 Pub. Employee Rep. (Ill.) par. 102, at 406, No. S--RC--05--109 (Illinois Labor Relations Board, State Panel, June 22, 2007) (2007 PERI (LRP) LEXIS 100, at *35) (hereinafter 23 Pub. Employee Rep. (Ill.) par. 102). If the answer is yes, the principal-work requirement is fulfilled. 23 Pub. Employee Rep. (Ill.) par. 102, at 406 (2007 PERI (LRP) LEXIS 100, at *35) . If the answer is no, the Board examines what the alleged supervisors do, to determine whether the ""nature and essence"" of their principal work is different from the ""nature and essence"" of their subordinates' principal work. 23 Pub. Employee Rep. (Ill.) par. 102, at 406 (2007 PERI (LRP) LEXIS 100, at *35-36), quoting City of Freeport, 135 Ill. 2d at 514, 554 N.E.2d at 163, quoting City of Burbank, 1 Pub. Employee Rep. (Ill.) par. 2008, at VIII-49, No. S--RC--45 (Illinois State Labor Relations Board, June 6, 1985) (1985 PERI (LRP) LEXIS 605). "This examination involves a consideration of the existence of the alleged supervisor's supervisory authority and ability to exercise it any time and to '*** identify the point at which an employee's supervisory obligation conflicts with his participation in union activity with the employees he supervises.'" 23 Pub. Employee Rep. (Ill.) par. 102, at 406 (2007 PERI (LRP) LEXIS 100, at *36), quoting City of Freeport, 135 Ill. 2d at 518, 554 N.E.2d at 164.

In the argument of its brief, under the heading "Telecommunications Supervisors Perform Principal Work Substantially Different [F]rom [T]hat of Their

Subordinates," the employer argues that "the principal work of [t]elecommunications [s]upervisors is obviously and visibly different from that of their subordinates." In support of that argument, the employer compares the principal work of a telecommunications supervisor to that of a call-taker. "[T]he principal work of the [t]elecommunications [s]upervisors," the employer says, "is to oversee the work of [c]all[-][t]akers and [l]ead [c]all[-][t]akers." The principal work of call-takers, by contrast, is "to operate the dispatch consoles[,] to answer emergency telephone calls from the public[] and radio calls for service from [s]tate troopers[] and other agencies[,] to dispatch troopers[,] to run criminal histories[,] to collect and enter other data[,] and to resolve problems with computer equipment."

The employer thereby shows that the principal work of a telecommunications supervisor is obviously and visibly different from that of a call-taker--but call-takers are not the only subordinates. Lead call-takers also are subordinate to telecommunications supervisors, and they have a job description separate from that of call-takers. Also, they are paid more. Vail testified she had to be careful about assigning lead call-taker duties to call-takers because call-takers might begin demanding lead call-taker pay. It appears that, in their duties, lead call-takers occupy a gray zone between call-takers and telecommunications supervisors. In the absence of the telecommunications supervisor, they are the supervisor of the shift. According to Mahon, lead call takers operate the radios but also, when necessary, call in employees to work overtime. As the union observes in its brief, lead call-takers also "monitor phone calls for quality and assist in evaluating other [c]all[-][t]akers, perform

quality checks[,] and assist with reports"--things a telecommunications supervisor does. Lane testified:

> "The [l]ead [c]all[-][t]aker position is *** a quasi-supervisory position[] in that [lead call-takers] provide shift or floor oversight. Obviously, a [t]elecommunications [s]upervisor can't work 24 hours a day and isn't able to be there across all three shifts. So the [l]ead [c]all[-][t]aker is there to *** monitor *** operational compliance[] [and] the integrity of the operations ***."

Thus, a lead call-taker answers the radio like a call-taker but also oversees the shift, trains and evaluates employees, assigns overtime, and prepares reports like a telecommunications supervisor. Which are the principal, or most important, duties of a lead call-taker? The answer is unclear. The employer does not identify any evidence in the record that would require a rational trier of fact to find that the duties a lead call-taker shares with a call-taker are more important than the supervisory duties a lead call-taker shares with the telecommunications supervisor. The Board could reasonably find that the principal work of a telecommunications supervisor is not obviously and visibly different from the principal work of a lead call-taker, who is, as Lane testified, a quasi-supervisor.

With respect to the principal-work requirement, the employer does not proceed to the second phase of the analysis: whether, if telecommunications supervisors were allowed to join the bargaining unit, the nature and essence of their principal work

would cause them to be torn between their allegiance to the employer and their allegiance to the union (see 23 Pub. Employee Rep. (Ill.) par. 102, at 406 (2007 PERI (LRP) LEXIS 100, at *36). Thus, we need not take up that question. The principal-work requirement is unfulfilled, and for that reason alone, an affirmance of the Board's decision is justified. We will consider, however, the remaining three requirements in section 3(r) (5 ILCS 315/3(r) (West 2006)).

2. <u>Do</u> <u>Telecommunications</u> <u>Supervisors</u> <u>Have</u>
<u>Authority</u> <u>To</u> <u>Perform</u> <u>Supervisory</u> <u>Functions?</u>

The second proposition the employer must prove, to obtain the exclusion of telecommunications supervisors from the bargaining unit, is that telecommunications supervisors have authority to perform 1 or more of the 11 supervisory functions. See <u>Chief Judge</u>, 153 Ill. 2d at 515, 607 N.E.2d at 186. Those functions are "to hire, transfer, suspend, lay off, recall, promote, discharge, direct, reward, or discipline employees[;] to adjust their grievances[;] or to effectively recommend any of those actions." 5 ILCS 315/3(r) (West 2006). The employer contends that telecommunications supervisors perform two supervisory functions: directing employees and disciplining them.

a. Directing Employees

The employer maintains that telecommunications supervisors direct their subordinates in seven ways: (1) monitoring and correcting their performance, (2) establishing work schedules, (3) assigning work, (4) determining the need for overtime, (5) granting leave and imposing proof status, (6) training employees, and (7) evaluating their performance. It is not enough, however, merely to point out these functions of direction; "the alleged supervisor must have <u>both</u> the authority to make operational

- 26 -

decisions and exercise significant discretionary authority that impacts his subordinates' employment status in areas most likely to fall within their terms and conditions of employment" (emphases added) (State of Illinois, Department of Central Management Services, 21 Pub. Employee Rep. (Ill.) par. 46, at 216, No. S--RC--04--038 (Illinois Labor Board, State Panel, March 25, 2005) (2005 PERI (LRP) LEXIS 43)).  As an ALJ explained in a recommended decision with which the Board agreed:

"The authority to direct involves functions relating to overseeing an employer's operations or which indicate responsibility for the performance of a subordinate's work. [Citations.]  These functions include reviewing and monitoring work activities, instructions on how work is to be performed, scheduling work hours, assigning work, and approving requests for leave or overtime[,] and completing performance evaluations.  [Citations.]  The Board has also previously held that these and any other function of direction are not supervisory direction absent evidence that the alleged supervisor possesses significant discretion to affect or impact the[] subordinates['] employment in areas likely to fall within the scope of union representation, such as wages, discipline, transfer, promotion, hir[ing,] or other working conditions."  Service Employees International Union, Local 73-HC, 19 Pub. Employee Rep. (Ill.) par. 58, at 265, No. L--

RC--02--014 (Illinois Labor Board, Local Panel, April 15,

2003) (2003 PERI (LRP) LEXIS 59).

See also City of Sparta, 9 Pub. Employee Rep. (Ill.) par. 2029, at X-150, No. S--RC--92--

100 (Illinois State Labor Relations Board, June 21, 1993) (1993 PERI (LRP) LEXIS 158).



The reasoning is that "absent such discretionary authority, an individual's responsibility

to direct subordinates in the performance of their job duties does not conflict with his

membership in a bargaining unit." City of Bloomington, 13 Pub. Employee Rep. (Ill.)

par. 2041, at X-236, No. S--UC--97--30 (Illinois State Labor Relations Board, August 25,

1997) (1997 PERI (LRP) LEXIS 129, at *8).  In the present case, the Board found that

"[a]lthough [telecommunications supervisors] overs[aw] their subordinates' work

activities[] and provide[d] them with instruction and assistance, they [were] unable to

affect the terms and conditions of their [subordinates'] employment, and oversight

authority alone [was] insufficient to constitute supervisory direction under the Act."  23

Pub. Employee Rep. (Ill.) par. 38, at 98 (2007 PERI (LRP) LEXIS 37, at *6).

The employer does not claim that telecommunications supervisors have

any influence over transfers.  Nor does the employer claim that telecommunications

supervisors are "supervisors," in the statutory sense, by virtue of their participation in

hiring committees.  It appears that the only means by which telecommunications

supervisors arguably have any influence over wages, discipline, and promotion are

performance evaluations and referrals for discipline--both of which serve, essentially, as

recommendations or suggested grounds for action by someone higher in the chain of

command.  Under section 3(r), a "supervisor" directs or disciplines employees (among

other possible supervisory functions) or "effectively recommend[s] any of those actions." 5 ILCS 315/3(r) (West 2006). The critical word is "effectively." "For a recommendation such as this to be [']effective['] within the meaning of the Act [(5 ILCS 315/3(r) (West 2006))], it must be adopted as a matter of course, without independent review." International Union of Operating Engineers, Local No. 150, 23 Pub. Employee Rep. (Ill.) par. 130, at 561, No. S--RC--06--175 (Illinois Labor Board, State Panel, September 4, 2007) (2007 PERI (LRP) LEXIS 128).

The employer argues that because no one higher in the chain of command ever requested a telecommunications supervisor to change the ratings in a performance evaluation and because Vail and Stec admitted that performance evaluations could affect promotions and influence the decision of whether to fire an employee, telecommunications supervisors have significant discretion to affect the terms and conditions of employment and, therefore, they "direct" employees. As authority for this argument, the employer cites Village of Hinsdale, 22 Pub. Employee Rep. (Ill.) par. 176, at 669-70, No. S--RC--06--037 (Illinois Labor Board, State Panel, December 13, 2006) (2006 PERI (LRP) LEXIS 181) (hereinafter 22 Pub. Employee Rep. (Ill.) par 176).

In Village of Hinsdale, the ALJ found that police sergeants employed by the village were "supervisors" because they had authority to discipline their subordinates by putting counseling statements in their personnel file, which could enhance future discipline. The Board agreed with that finding. The ALJ found, however, that the sergeants' authority to evaluate their subordinates' performance was not indicative of supervisory authority. The employer filed an exception to that finding, and the Board agreed with the employer. The sergeants were required to evaluate patrol

officers in 25 categories, rating their performance as "'below standard,'" "'standard,'" or "'above standard'" in each category. Three of the rating categories--warning citations, traffic citations, and parking citations--were based solely on the number of citations the patrol officer had issued during the year, so the sergeant's rating in those categories was automatic and did not require the use of independent judgment. But the remaining categories--e.g., problem-solving, performance under pressure, and interpersonal skills--were more subjective and called for independent judgment by the sergeant. The Board said:

> "It is also apparent that the component ratings, which control the overall rating, affect the patrol officers' terms and conditions of employment. A patrol officer must achieve an overall 'standard' to advance to the next pay grade. While the record indicates that most officers do so on an annual basis, the record does demonstrate that[,] in one instance[,] a patrol officer failed to advance for three straight years, based on a sergeant's negative overall rating.

> While the evaluations are reviewed by higher[-]level officials, the record reflects that the sergeants' ratings of their subordinates--both the 25 components and the overall ratings--have never been changed. Thus, these are effective recommendations within the meaning of [s]ection 3(r) of the Act. [Citation.] As these evaluations directly affect the

patrol officers' terms and conditions of employment, that is, their wages, the sergeants exercise the supervisory authority to direct in evaluating the patrol officers." 22 Pub. Employee Rep. (Ill.) par. 176, at 670 (2006 PERI (LRP) LEXIS 181, at *5-6).

In a footnote in Village of Hinsdale, the Board said:

"As noted by the [ALJ], the evaluations also contain narrative comments. ***

       ***

As found by the [ALJ], the record shows that the evaluations are reviewed and higher-level officials sometimes add to or change the narrative comments. It is fairly typical, especially in a paramilitary organization, that the review would include some input by the higher-level officials, and we do not believe that it demonstrates that the sergeants lack independent judgment in preparing their comments in the first instance. In any event, however, it is the ratings, not the comments, which determine whether a patrol officer receives a pay increase, and the evidence is clear that the higher-level officials have never changed those ratings. Thus, the sergeants make effective recommendations which directly impact their subordinates' wages." 22 Pub. Employee Rep.

(Ill.) par. 176, at 670 n. 1 (2006 PERI (LRP) LEXIS 181, at *6 n.1).

The present case is distinguishable from <u>Village of Hinsdale</u> for five reasons. First, it is unclear, from the record before us, that telecommunications supervisors use independent judgment in evaluating their subordinates because we do not know the categories in the performance evaluations and, therefore, we are unable to say that the categories are more subjective than quantitative. Second, it is unclear how often call-takers and lead call-takers receive an opportunity for promotion (in contrast to the Hinsdale patrol officers, most of whom advanced to the next pay grade each year). Third, in the present case, promotions appear to depend more on seniority than performance evaluations. It is theoretically possible that a junior employee could be promoted over a senior employee if performance evaluations showed the junior employee to be "considerably more qualified for the position," but there appears to be no evidence in the record that performance evaluations have, in practice, ever trumped seniority or affected anyone's promotion. Fourth, telecommunications supervisors do not exercise independent judgment, in the first instance, when writing the comments in performance evaluations. Sometimes, while a performance evaluation is "still in the planning process," the regional manager will require a telecommunications supervisor to revise the performance evaluation so that a rating and the corresponding comment are in congruence. Such a revision necessarily would entail a substantive change in either the comment or the rating. This is different from <u>Village of Hinsdale</u>, in which the higher-level officials made additions or changes in the comments themselves. Fifth, it is unclear that the comments in a call-taker's or lead call-taker's performance evaluation

are less important than the ratings. In sum, the Board could reasonably find that telecommunications supervisors' authority to evaluate their subordinates does not amount to significant discretionary authority to affect their subordinates' terms and conditions of employment and, thus, their responsibility for the subordinates' competent performance is not supervisory authority to "direct" employees within the meaning of section 3(r) (5 ILCS 315/3(r) (West 2006)). See 23 Pub. Employee Rep. (Ill.) par. 102, at 400 (2007 PERI (LRP) LEXIS 100, at *5) ("on occasion, the chief has suggested modifications to evaluations completed by the sergeants").

We say this is a reasonable finding by the Board, not an ineluctable finding. There is some evidence in the record to support the opposite finding, and we do not mean to ignore that evidence. For example, the class specification says that a telecommunications supervisor "promotes or terminates trainees, as appropriate." The Board could reasonably find, however, that despite this unqualified language in the job description, telecommunications supervisors, in practice, do not have significant discretionary authority to affect the employment of trainees. Mitchell testified that she "suggested" to her superiors that an underperforming trainee not be certified. Mahon testified that when she recommended the firing of a trainee, she had to submit proof in support of her recommendation. Instead of following her recommendation, with no questions asked, Mahon's superiors required her to make a case with the weekly training evaluations. It appears that these weekly training evaluations are designed to eliminate subjectivity or discretion. "A decision is not against the manifest weight of the evidence and must be affirmed if any evidence fairly supports the determination of the administrative agency." Roti, 355 Ill. App. 3d at 1051, 823 N.E.2d at 645. We do not

reweigh the evidence or make an independent determination of the facts; if the record allows a reasonable difference of opinion, our duty is to affirm. Roti, 355 Ill. App. 3d at 1051, 823 N.E.2d at 645. Insomuch as the question is whether the facts fit the statute-- whether a telecommunications supervisor "direct[s]" employees, as the Board and case law have interpreted that statutory term--we are not left with a firm and definite conviction that a negative answer is a mistake. See AFSCME Council 31, 216 Ill. 2d at 577-78, 839 N.E.2d at 485.

Likewise, the creation of schedules and the assignment of work are inconsequential oversight functions unless the alleged supervisor has authority to affect the employment of his or her subordinates. Metropolitan Alliance of Police, Sergeants Chapter No. 435, 23 Pub. Employee Rep. (Ill.) par. 72, at 246, No. S--RC–06–005 (Illinois Labor Board, State Panel, April 27, 2007) (2007 PERI (LRP) LEXIS 69, at *8) (hereinafter 23 Pub. Employee Rep. (Ill.) par. 72). As we have explained, telecommunications supervisors lack such authority, or so the Board could reasonably have found. That a lead call-taker or even a call-taker, who are members of the bargaining unit, can call in employees to perform overtime tends to confirm that scheduling is not a quintessentially "supervisory" act. Moreover, a telecommunications supervisor's discretion in scheduling is narrowly cabined by shift-bidding and minimum manpower requirements. See 23 Pub. Employee Rep. (Ill.) par. 72, at 246 (2007 PERI (LRP) LEXIS 69, at *7) ("[s]ergeants' role in approving vacations or other time off for the employees in the subordinate ranks is dictated by the minimum manpower requirements, department rules, or the officers' collective[-]bargaining agreement").

b. Disciplining Employees

- 34 -

In the argument of its brief, the employer says, without citation to the record, that telecommunications supervisors "have discretion as to whether they will issue a written reprimand." See 177 Ill. 2d R. 341(e)(7) ("Argument, which shall contain the contentions of the appellant and the reasons therefor, with citation of the authorities and the pages of the record relied on"). In the "Statement of Facts" in its brief, the employer cites Mitchell's testimony that she once disciplined an employee for late arrival. But when one reads the rest of Mitchell's testimony, it becomes apparent that she herself was not the one who imposed the discipline. She testified that she recommended to the assistant bureau chief that the employee receive a letter of reprimand and, as a result of her recommendation, the employee received one. Telecommunications supervisors can verbally counsel employees. Such verbal counseling, however, is not supervisory in nature unless it affects the terms and conditions of employment, and the record appears to contain no evidence that it does. See County of Lake & Sheriff of Lake County, 16 Pub. Employee Rep. (Ill.) par. 2036, at X-160, No. S--UC--99--017 (Illinois State Labor Relations Board, July 7, 2000) (2000 PERI (LRP) LEXIS 384) (hereinafter 16 Pub. Employee Rep. (Ill.) par. 2036) . We are aware of no evidence that telecommunications supervisors have discretion to issue written reprimands. It appears that when discipline becomes necessary, all they may do is recommend the issuance of a letter of reprimand (or other discipline) and then their superiors either accept or reject that recommendation. Vail recommended a letter of reprimand, but her superiors declined to follow her recommendation and instead imposed a more severe punishment--suspension for a day. Stec denied that she had authority to impose discipline before speaking with someone higher in the chain of

command.  Her experience was similar to Vail's:  higher-ranking officials did not always follow her recommendations in matters of discipline.  Stec testified:  "Something that I thought would warrant a written reprimand[] ended up with a more severe discipline."  See 23 Pub. Employee Rep. (Ill.) par. 72, at 246 (2007 PERI (LRP) LEXIS 69, at *8-9) ("the sergeants need approval from the deputy chief to issue an oral or written reprimand").  On the basis of such evidence, a reasonable trier of fact could find that telecommunications supervisors' recommendations as to discipline are not "adopted as a matter of course," without independent review and, therefore, telecommunications supervisors lack authority to "effectively recommend" discipline (emphasis added) (5 ILCS 315/3(r) (West 2006)).  See County of Cook v. Illinois Labor Relations Board--Local Panel, 351 Ill. App. 3d 379, 396, 813 N.E.2d 1107, 1122 (2004), appeal denied, 212 Ill. 2d 530, 824 N.E.2d 283 (2004).

### 3. The Negation of the Remaining Two Elements in Section 3(r), Since Telecommunications Supervisors Do Not Perform Supervisory Functions

The third proposition the employer had to prove was that telecommunications supervisors consistently used independent judgment in performing supervisory functions.  See Chief Judge, 153 Ill. 2d at 515, 607 N.E.2d at 186.  The fourth proposition was that telecommunications supervisors devoted a preponderance of their time to exercising supervisory functions.  See Chief Judge, 153 Ill. 2d at 515, 607 N.E.2d at 186.  By failing to prove that telecommunications supervisors performed supervisory functions, the employer necessarily failed to prove those remaining two propositions.  See 16 Pub. Employee Rep. (Ill.) par. 2036, at X-160 (2000 PERI (LRP) LEXIS 384).

### III. CONCLUSION

For the foregoing reasons, we affirm the Board's decision.

Affirmed.

KNECHT, J., concurs.

COOK, J., dissents.

JUSTICE COOK, dissenting:

I respectfully dissent. I would reverse the decision of the Board and accept the ALJ's recommended order.

The State Police have 19 telecommunication centers throughout the state that support police and law-enforcement operations by answering emergency telephone calls from the public and radio calls for service from state troopers and other agencies. The centers dispatch troopers, run criminal histories, and collect and enter data. The telecommunications centers are administered by the Communications Service Bureau. The highest officials at the telecommunication centers are the 19 telecommunication supervisors, who report to but infrequently confer with the 4 Regional Managers. Two of the telecommunications supervisors actually function as regional managers. Each telecommunication supervisor has between 7 and 22 subordinates, including call-takers

and lead call-takers who are usually assigned to shifts the telecommunications supervisor does not work.

The telecommunications supervisor oversees all communication operations at the center and trouble shoots. He or she observes call-takers' and lead call-takers' compliance with law, policy, procedures, and protocol, and also corrects their errors. The telecommunications supervisor schedules call-takers' work hours, decides overtime, prepares written reports, mediates employee disputes, evaluates employees, and handles leave requests. Telecommunications supervisors are on call 24 hours a day. The telecommunications supervisor monitors the work of subordinates by using a scanner, sometimes even when he or she is off duty at home. He or she carries a pager and cell phone so that he or she may be contacted when an issue arises. When a telecommunications supervisor hears a call-taker or lead call-taker giving wrong information or observes him or her not conforming to policy, he or she may immediately counsel the individual. The telecommunications supervisor may also transfer a subordinate to a different shift to allow greater monitoring and instruction.

A telecommunications supervisor annually evaluates subordinate call-takers and lead call-takers. Telecommunications supervisors make hiring recommendations. Telecommunications supervisors effectively recommend the discharge of trainee employees. The telecommunications supervisor may issue written reprimands, which remain in an employee's personnel file for two years. In practice, those reprimands have been acted upon by the Assistant Bureau Chief and by Regional Managers.

An employee is a "supervisor" if (1) his or her principal work is substantially different from her subordinates; (2) he or she has authority to do things such as "direct" or "discipline" employees; (3) that authority is not of a merely routine or clerical nature, but requires the consistent use of independent judgment; and (4) he or she devotes a preponderance of her employment time to exercising that authority. 5 ILCS 315/3®) (West 2006). "Preponderance" is not determined by a strictly mathematical test. Whether a person is a supervisor should be defined by the significance of what that person does for the employer, regardless of the time spent on particular types of functions. County of Vermilion v. Illinois Labor Relations Board, 344 Ill. App. 3d 1126, 1136, 800 N.E.2d 875, 882 (2003).

The question presented in this case is an important one. There would be a conflict of interest if supervisors, who must apply the employer's policies to subordinates, are subject to control by the same union representing those subordinates. Freeport, 135 Ill. 2d at 517, 554 N.E. 2d at 164. In this case, as in Freeport, if the telecommunications supervisors are not statutory "supervisors," the telecommunications centers operate "entirely without supervision a large part of the time." Freeport, 135 Ill. 2d at 522, 554 N.E. 2d at 166. In fact, because Regional Managers only occasionally travel to communications centers for meetings and interviews, the situation here may be more aggravated than that in Freeport.

The majority concludes that the principal work of the telecommunications supervisors is not significantly different from that of the lead call-takers. Lead call-takers monitor operations in the telecommunications supervisor's absence, but otherwise have no oversight responsibility. Lead call-takers do not prepare schedules,

prepare written reports, mediate employee disputes, evaluate employees, handle leave requests, make hiring recommendations, issue written reprimands, or recommend the discharge of trainees. Lead call-takers are basically call-takers, members of the bargaining unit. City of Naperville, 8 Pub. Employee Rep. (Ill.) par. 2016, at X-99, No. S--RC--92--15 (Illinois State Labor Relations Board, April 1, 1992) (1992 PERI (LRP) LEXIS 88) (holding that lead call-takers are members of the bargaining unit because they do not devote a preponderance of their time to supervisory activities). The majority recognizes that call-takers are not supervisors. If the majority is correct that lead call-takers are more like telecommunications supervisors than they are call- takers, then lead call-takers should be considered supervisors, not vice-versa.

The majority states that it is "aware of no evidence that telecommunications supervisors have discretion to issue written reprimands." Slip op. at 36. The majority is mistaken. I agree with the ALJ that the record evidence establishes that telecommunications supervisors have authority to counsel employees for instances of misconduct and have discretion as to whether they will issue a written reprimand after several repeated instances of misconduct. Written reprimands remain in an employee's personnel file for two years. "Telecommunications [s]upervisors exercise independent judgment in issuing written reprimands because they choose between two or more significant courses of action, counseling or a written reprimand." 23 Pub. Employee Rep. (Ill.) par. 38, at 103 (Illinois Labor Board, State Panel, Administrative Law Judge's Recommended Decision and Order, March 19, 2007) (2007 PERI (LRP) LEXIS 37, at *34).

The Board concluded telecommunications supervisors have no authority to

discipline employees because "[t]here was no evidence that the written reprimands authored by the employees at issue [(telecommunications supervisors)], and placed in their subordinates' personnel files, affected their employment, nor evidence that such reprimands were subsequently used to enhance later discipline." Written reprimands are just a meaningless ritual? The majority takes a different tack, that higher-ranking officials did not always follow the recommendations of the telecommunications supervisors, that they sometimes imposed more severe punishment. Slip op. at 36. The fact of the matter is that there would be no discipline absent the recommendation of the telecommunications supervisors. There is no evidence that the recommendations of the telecommunications supervisors were ever ignored, only that higher ranking officials sometimes went beyond those recommendations. The Board's conclusion that the recommendations had no effect on the subordinates' employment is clearly erroneous. The subordinates had to be concerned with the views of the telecommunications supervisors, not the views of the Regional Managers--whom they almost never saw.