# ILLINOIS OFFICIAL REPORTS

## Appellate Court

***Secretary of State v. Illinois Labor Relations Board, State Panel***, 2012 IL App (4th) 111075

| | |
|---|---|
| Appellate Court Caption | THE SECRETARY OF STATE, Petitioner, v. THE ILLINOIS LABOR RELATIONS BOARD, STATE PANEL; JACALYN J. ZIMMERMAN, MICHAEL HADE, MICHAEL COLI, ALBERT WASHINGTON, and JESSICA KIMBROUGH, the Members of Said Board and Panel in Their Official Capacity Only; JOHN F. BROSNAN, Executive Director of Said Board in His Official Capacity Only; and SERVICE EMPLOYEES INTERNATIONAL UNION, LOCAL 73, Respondents. |
| District & No. | Fourth District<br>Docket No. 4-11-1075 |
| Rule 23 Order filed<br>Rule 23 Order<br>withdrawn<br>Opinion filed<br>Rehearing denied | November 29, 2012<br><br>January 4, 2013<br>November 29, 2012<br>January 10, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The decision of the Illinois Labor Relations Board certifying respondent union as the exclusive bargaining representative of a group of employees of the Secretary of State with the title of "executives" based on the finding that the "executives" were not supervisors or managers under the Illinois Public Labor Relations Act was upheld, since the Secretary failed to present evidence that the "executives" directed the effectuation of the Secretary's policies. |
| Decision Under Review | Petition for review of order of Illinois Labor Relations Board, State Panel, No. S-RC-11-006. |

| | |
|---|---|
| Judgment | Affirmed. |
| Counsel on Appeal | Joseph M. Gagliardo and Lawrence Jay Weiner (argued), Special Assistant Attorneys General, of Chicago, for petitioner. |
| | Susan M. Matta, of Chicago, for respondent Service Employees International Union, Local 73. |
| | Lisa Madigan, Attorney General, of Chicago (Michael A. Scodro, Solicitor General, and Christopher M.R. Turner (argued), Assistant Attorney General, of counsel), for respondent Illinois Labor Relations Board. |
| Panel | JUSTICE KNECHT delivered the judgment of the court, with opinion. |
| | Presiding Justice Steigmann and Justice Appleton concurred in the judgment and opinion. |

**OPINION**

¶ 1     The Secretary of State (Secretary) seeks review of a final decision and order of the Illinois Labor Relations Board, State Panel (Board), certifying Service Employees International Union, Local 73 (Union), as the exclusive bargaining representative of "approximately 116" individuals employed by the Secretary.

¶ 2     The Secretary contends (1) the Board lacked jurisdiction to address the Union's representation petition, and (2) the Board's determinations (a) the individuals were not supervisors under section 3(r) of the Illinois Public Labor Relations Act (Labor Act) (5 ILCS 315/3(r) (West 2010)) and (b) were not managers under section 3(j) of the Labor Act (5 ILCS 315/3(j) (West 2010)) were clearly erroneous. We affirm.

¶ 3                                      I. BACKGROUND

¶ 4     The Union is a labor organization as defined by section 3(i) of the Labor Act (5 ILCS 315/3(i) (West 2010)). The Union represents a bargaining unit that includes some, but not all, employees with the title of executive I or executive II. The unit also includes employees with the following titles: accountant IV, accountant V, administrative assistant I, administrative assistant II, administrative assistant III, administrative clerk, auto parts auditor supervisor, communications network technician, corporation specialist III, driver facility

-2-

manager I, driver facility manager II, facility personnel officer, microfilm lab technician III, motor carrier reciprocity prorate auditor, office operations supervisor, personnel officer I, personnel officer II, personnel officer III, printing equipment supervisor, private secretary I, private secretary II, public service supervisor, and training specialist.

¶ 5     The bargaining unit is covered under a collective bargaining agreement that expired on June 30, 2012. The Secretary is a public employer within section 3(o) of the Labor Act and a unit of local government under section 20 of the Labor Act (5 ILCS 315/3(o), 20(b) (West 2010)).

¶ 6                                 A. The Petition

¶ 7     In July 2010, the Union filed an election petition seeking to include 119 individuals employed by the Secretary in its existing bargaining unit with the Secretary. (We note the Union's petition sought the inclusion of 119 employees, but the Board's October 2011 order characterized the Union's petition as seeking only to add "approximately 116 employees." The August 2011 recommended decision and order of the administrative law judge (ALJ) explained while the Secretary contended 119 employees were at issue, one of the Union's exhibits, which was stipulated into evidence, listed only 116 employees.) The individuals all hold job designation of executive I or executive II (hereinafter referred to collectively as Executives). Later that month, the Union amended the petition to a majority interest petition, providing cards signed by a majority of employees.

¶ 8     On July 29, 2010, an ALJ ordered the Secretary to show cause why the petitioned-for unit should not be certified. The ALJ cautioned the Secretary against relying on "vague, generalized testimony or contentions as to an employee's job function."

¶ 9     In August 2010, the Secretary submitted its offer of proof with respect to all positions at issue, arguing the Executives should be excluded from the proposed bargaining unit because of their supervisory status. See 5 ILCS 315/3(r) (West 2010). In support of its offer of proof, the Secretary attached questionnaires that had been filled out by the supervisors of each Executive.

¶ 10    On May 4, 2011, a newly appointed ALJ scheduled an oral hearing for May 23 to 25, 2011. That day, the Secretary filed a motion to dismiss, asserting the Board no longer had jurisdiction over the matter because section 9(a-5) of the Labor Act (5 ILCS 315/9(a-5) (West 2010)) required the Board to conclude the hearing process within 120 days of the filing of the Union's majority interest petition. The Union also disputed the Board's failure to resolve the matter within 120 days, arguing because the 120-day due date had passed, the Board should issue certification *nunc pro tunc* to November 13, 2010. The ALJ denied both parties' motions, and the parties later renewed their arguments at the administrative hearing.

¶ 11    On May 18, 2011, the Secretary submitted a prehearing memorandum, adding as an additional argument 26 of the Executives should be excluded from the bargaining unit because they were managerial employees as defined by section 3(j) of the Labor Act (5 ILCS 315/3(j) (West 2010)). The Union objected, contending the Secretary's managerial argument was untimely and prejudiced the Union.

¶ 12                              B. The Administrative Hearing

¶ 13      The Union and Secretary appeared for an administrative hearing on May 23, 2011, at which the ALJ allowed the Secretary to proceed on its managerial argument, with the requirement the Secretary stipulate it was only proceeding on the matter-of-fact test.

¶ 14      Thereafter, the parties presented the following evidence.


¶ 15                              1. *Gary Lazzerini's Testimony*

¶ 16      Gary Lazzerini, director of driver services (hereinafter Driver Services) for the metro area, testified as the Secretary's sole witness. Driver Services is one of the Secretary's subsidiary divisions. It maintains 25 facilities in Chicago and its collar counties and 105 facilities in downstate Illinois. Driver Services issues and maintains the records of driver's licenses and state identification cards and handles the state organ donor and federal motor voter programs. The parties stipulated Lazzerini's testimony would be relevant as to all Executives at issue. Lazzerini's testimony on direct examination and cross-examination spanned 22 total pages of transcript and revealed the following facts.


¶ 17                              a. Directing Employees

¶ 18      Executive Is are typically assistant managers and executive IIs are typically facility managers. In personnel hierarchy, Executives are subordinate to directors, deputy directors, administrators, and zone managers. Beneath the Executives are public service representatives and clerks. The number of employees each Executive supervises depends on the size of the facility at which the Executive works. The Executives typically do not have on-site superiors at their facilities.

¶ 19      According to Lazzerini, the primary function of the Executives "is to direct, manage, and supervise the employees of the facility." When asked what Executives direct their employees to do, Lazzerini testified "they're directing them to do their job *** that's in the job description, they're directing them as far as the different shifts, the different breaks, job assignments, job duties." He explained Executives assign staff to different work areas within their facilities, such as at the greeter's desk, based on the operational needs of the facility.

¶ 20      Overall, Lazzerini estimated the Executives spend 75% to 80% of their time in a supervisory or managerial function.


¶ 21                              b. Evaluating Employees' Performance

¶ 22      According to Lazzerini, the Executives evaluate probationary employees twice a year, and those evaluations determine whether a probationary employee becomes a full-time employee. The Executives also evaluate nonprobationary employees once a year, and those evaluations "[have] a significance" in determining pay raises and promotions. Lazzerini explained employee pay increases as a whole are calculated according to collective-bargaining agreements; however, if an employee receives a score of two or below on a four-point scale in two evaluation periods, the employee may not receive a pay raise and could lose his job.

¶ 23    After the Executives fill out employee evaluations, the department of personnel reviews the evaluations "to make sure that the justifications fit with the scoring." The department brings any problems with the evaluations to the Executives, who make changes accordingly. Lazzerini testified zone managers also review the evaluations "at times," but the managers do not direct the Executives "at all"; rather, the managers serve as a "sounding board" to the Executives.

¶ 24                              c. Disciplining Employees

¶ 25    Lazzerini testified Driver Services has a progressive discipline system which starts with oral warnings, followed by written warnings, suspensions, and then discharge. Executives initiate the disciplinary process by identifying and bringing to the administration's attention any disciplinary requests. Executives only have authority to issue oral, verbal, or written warnings but may recommend higher disciplinary action. When an Executive recommends suspension, the director conducts a ground-level investigation, obtains witness statements, and sends the investigation's results to the personnel department. Lazzerini testified the Executives' disciplinary recommendations are accepted a majority of the time.

¶ 26                              d. Scheduling Employees

¶ 27    According to Lazzerini, Executives also "handle the day-to-day attendance" of employees. He explained the Secretary's policy requires facility employees to submit vacation requests toward the beginning of the year. The Executives then approve vacation requests based on (1) seniority, (2) the collective-bargaining agreement's required staffing levels and allowance for two employees at a facility to be on vacation at a given time, and (3) the workload at the facility. Lazzerini did not know if the Executives ever deny time off when the requisite staff levels are met.

¶ 28                              2. *Documentary Evidence*

¶ 29    In addition to Lazzerini's testimony, the Secretary submitted over 3,000 pages of exhibits, consisting of (1) organizational charts; (2) employee questionnaires completed by supervisors of the Executives; (3) position descriptions; (4) oral and written warning notices made by the Executives; (5) performance evaluations completed by the Executives; (6) performance evaluations about the Executives completed by their supervisors; and (7) various memoranda and emails purporting to show the Executives directing their subordinates. Following the hearing, the Secretary also submitted a chart providing information about 108 of the Executives, including their working titles, departments and location assignments, number of supervised subordinates, and whether they are the top-ranked employees at their work locations. The document shows the Executives are all either managers, assistant mangers, or assistant managers currently serving as managers. Sixty-nine of the Executives are the highest-ranked employees at their facilities. The Executives supervise between 1 and 51 subordinates.

¶ 30    The Union stipulated to the authenticity of the Secretary's documents, reserving the right

to argue the applicability of the documents to the law. For its part, the Union offered into evidence the collective-bargaining agreement between the Union and the Secretary as well as a document providing information about each Executive's supervisor. The Union's document listed 116 Executives–73 executive Is and 43 executive IIs.

¶ 31    In June 2011, the Union and Secretary both filed posthearing briefs. In his brief, the Secretary expanded his managerial argument to argue that all of the Executives at issue should be excluded because they were managers under the Labor Act.

### C. The ALJ'S Recommended Decision

¶ 33    In August 2011, the ALJ issued a recommended decision and order, recommending the Board grant the Union's petition. First, the ALJ rejected the Secretary's jurisdictional argument, concluding section 9(a-5) of the Labor Act is not jurisdictional in nature. Likewise, the ALJ rejected the Union's contention the passage of the 120-day deadline entitled it to *nunc pro tunc* certification.

### 1. *Supervisory Exception*

¶ 35    With respect to the Executives' alleged supervisory status, the ALJ found the Secretary failed to show the Executives spend a preponderance of their time performing supervisory functions. Specifically, the ALJ found the Secretary failed to show the Executives exercise supervisory authority when directing their subordinates because the evidence did not show the Executives' directory role required them to consistently use independent judgment. The ALJ noted the Secretary relied on conclusory testimony and survey statements and vague references to examples in the record. The few specific examples the Secretary did provide failed to show the Executives exercised independent judgment when overseeing their subordinates.

¶ 36    While the ALJ did not find the Executives exercise supervisory authority when directing employees, the ALJ did find the Executives act in a supervisory role when they (1) issue discipline, (2) reward employees, and (3) discharge nonprobationary employees. However, the ALJ found the Secretary failed to show the Executives spend a preponderance of their time performing these functions. The ALJ noted the Secretary did not describe the Executives' day-to-day activities in sufficient detail but, rather, relied on Lazzerini's conclusory testimony and broad citations to the surveys and job descriptions submitted into evidence. Further, the ALJ pointed out Lazzerini asserted the Executives spend at least 75% of their time directing employees. Thus, the ALJ reasoned the Executives must spend no more than 25% of their time issuing discipline, rewarding employees, and discharging nonprobationary employees. Based on this, the ALJ concluded the Secretary failed to show the Executives spend a preponderance of their time exercising supervisory authority.

### 2. *Managerial Exception*

¶ 38    Likewise, the ALJ concluded the Secretary failed to show the Executives were managerial employees because the evidence did not establish the Executives formulate policy

and procedure or effectuate policy through their recommendations.

¶ 39                              3. *ALJ Recommends Certification*

¶ 40        Based on the foregoing, the ALJ recommended the Board certify the Union as the exclusive representative of the Executives. Thereafter, the parties both filed exceptions to the ALJ's findings and responses to each other's exceptions.

¶ 41                              D. The Board's Decision

¶ 42        In October 2011, the Board issued a written decision, adopting the ALJ's recommendations and granting the Union's petition to add the Executives to its certified collective-bargaining agreement with the Secretary. *Service Employees International Union, Local 73*, 28 PERI ¶ 68 (ILRB State Panel 2011). Like the ALJ, the Board rejected both the Secretary's and the Union's arguments with respect to the Board's failure to hold a hearing within 120 days.

¶ 43        The Board also rejected the Secretary's argument the Executives were supervisors within the meaning of section 3(r) of the Labor Act. The Board concluded the Secretary failed to present evidence showing how much time the Executives spend rewarding, disciplining, and discharging employees, thereby failing to satisfy the "preponderance-of-time" requirement. Further, the Board found the Secretary failed to show the Executives use independent judgment to direct subordinates because (1) the Secretary relied on conclusory testimony and job descriptions, and (2) the questionnaires and other documentary evidence submitted by the Secretary merely showed the Executives directing subordinates to do routine tasks outlined in their job descriptions–direction that does not require independent judgment. Thus, the Board concluded the evidence failed to show the Executives exercise supervisory authority when directing subordinates.

¶ 44        In addition, the Board found the Secretary failed to show the Executives were managerial employees because the Secretary did not show the Executives (1) were engaged predominantly in executive and management functions or (2) exercised responsibility for directing the effectuation of management policies and functions. In so holding, the Board rejected the Secretary's contention the Executives who were the highest-ranking employees at their facilities were necessarily managerial.

¶ 45        The Board directed its Executive Director to issue a certification consistent with its order. In November 2011, the Board's Executive Director issued a certificate of representation, certifying the Union as the exclusive representative of the Executives.

¶ 46        This appeal followed.

¶ 47                              II. ANALYSIS

¶ 48        On appeal, the Secretary contends (1) the Board erred by denying the Secretary's motion to dismiss because the Board lacked jurisdiction to address the Union's representation petition, and (2) the Board's determinations (a) the individuals were not supervisors under section 3(r) of the Labor Act (5 ILCS 315/3(r) (West 2010)) and (b) the individuals were not

managerial employees under section 3(j) of the Labor Act (5 ILCS 315/3(j) (West 2010)) were clearly erroneous. We address the Secretary's contentions in turn.

¶ 49                                    A. Standard of Review

¶ 50    Our review of the Board's decision is governed by the Administrative Review Law (735 ILCS 5/3-101 to 3-113 (West 2010)). *American Federation of State, County & Municipal Employees, Council 31 v. Illinois State Labor Relations Board, State Panel*, 216 Ill. 2d 569, 577, 839 N.E.2d 479, 485 (2005). We review questions of pure fact under a manifest weight of the evidence standard, while we review pure questions of law *de novo*. *Department of Central Management Services/The Department of Public Health v. Illinois Labor Relations Board, State Panel*, 2012 IL App (4th) 110013, ¶¶ 50-51. Where an agency's decision presents mixed questions of law and fact, we review the decision under a " 'clearly erroneous' " standard. *American Federation of State, County & Municipal Employees*, 216 Ill. 2d at 577, 839 N.E.2d at 485. Applying this "extremely deferential" standard, we will reverse an agency's decision only when we are "left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *Board of Education of Glenview Community Consolidated School District No. 34 v. Illinois Educational Labor Relations Board*, 374 Ill. App. 3d 892, 899, 874 N.E.2d 158, 164-65 (2007).


¶ 51           B. The Union's Assertion the Secretary Has Forfeited His Arguments

¶ 52    Before turning to the Secretary's substantive arguments, we wish to address the Union's assertion we should deem the Secretary's arguments forfeited in this case. (We note, in its brief, the Union argued the Secretary "waived" his arguments. However, "waiver" refers to a voluntary relinquishment of a right, whereas "forfeiture" refers to procedural default. *People v. Blair*, 215 Ill. 2d 427, 444 n.2, 831 N.E.2d 604, 615 n.2 (2005).)

¶ 53    The Union asserts the Secretary "failed to put on a competent case" by (1) calling one witness at the administrative hearing, which lasted less than three hours, (2) failing to show how the thousands of exhibits he submitted to the Board demonstrate the Executives' supervisory or managerial status, and (3) relying extensively on block quotations in his brief on appeal.

¶ 54    The Union's complaints are well taken. In May 2011, the ALJ accorded the Secretary the opportunity of a hearing to prove the Executives' supervisory or managerial status. Upon being granted that hearing, the Secretary's attorney, Lawrence Weiner, elected to call a single witness, Lazzerini, and proceeded to conduct a direct examination of Lazzerini consisting of roughly 50 questions and answers comprising 10 transcript pages. The Secretary also submitted approximately 14 volumes of exhibits. In his brief to this court, the Secretary cites these exhibits for broad propositions–such as "[f]or examples of Executives' direction of subordinates, *see* R 740-744"–but fails to articulate exactly what these exhibits allegedly show. In two separate footnotes, the Secretary merely instructs us to "[s]ee Appendix for complete list of exhibits."

¶ 55    As the party seeking to exclude the Executives from the bargaining unit, the Secretary carried the burden of proving the Executives' supervisory or managerial status by a

preponderance of the evidence. See *Department of Central Management Services (State Police) v. Illinois Labor Relations Board, State Panel*, 382 Ill. App. 3d 208, 220-21, 888 N.E.2d 562, 575 (2008). To do so, the Secretary needed to present specific evidence as to *each* Executive and connect that evidence to the controlling law. The Secretary may not foist his burden on the ALJ, the Board, or this court. See *People v. Snow*, 2012 IL App (4th) 110415, ¶ 11, 964 N.E.2d 1139 ("[T]his court is not a depository into which the appellant can dump his burden of argument and research.").

¶ 56     Because we conclude the Secretary's performance goes to whether he carried his burden of proof, and not to whether he forfeited his case, we will address the Secretary's claims on the merits. In doing so, however, we are mindful it is not this court's responsibility to sift through the record and make the Secretary's arguments for him.

¶ 57     In addition, we note the Secretary's choice to call a single witness in this case served as a detriment to meeting his burden of proof. Lazzerini's testimony failed to provide details about any of the Executives' day-to-day activities and failed to provide background information about any of the thousands of exhibits the Secretary submitted–information that would have been useful in determining how, exactly, the exhibits demonstrated the Executives acting in a supervisory or managerial function. Perhaps this was due to the Secretary's limited questioning of Lazzerini, or perhaps this was due to Lazzerini's position as the director of Driver Services for the metro area–a position that did not allow Lazzerini to observe each of the Executives on a daily basis. Whatever the reason, in this case, where the Union sought to include in its bargaining unit over 100 employees who worked in various subdivisions of the Secretary of State, the Secretary's reliance on Lazzerini's testimony did little to assist him in proving, by a preponderance of the evidence, the Executives were supervisors or managers. We reiterate, to meet his burden of proof, the Secretary needed to develop his arguments as to each specific employee, providing citations to the record, that is, to (1) synthesize, (2) analyze, and (3) explain to the finder of fact exactly how the various facts within the items of stipulated evidence proved the employees were supervisors or managers under the Labor Act.

¶ 58                    C. The Secretary's Contention the Board Lacked
                         Jurisdiction To Address the Petition

¶ 59     The Secretary first argues, without citation to authority, the Board erred by holding it retained jurisdiction over the Union's petition. Specifically, the Secretary contends section 9(a-5) is mandatory and requires the Board to conclude its hearing process and issue a certification within 120 days. The Union and Board respond the 120-day time period set forth in section 9(a-5) is directory, not mandatory.

¶ 60     Whether a statutory command is mandatory or directory is a question of statutory construction, which we review *de novo*. *People v. Robinson*, 217 Ill. 2d 43, 54, 838 N.E.2d 930, 936 (2005). Section 9(a-5) of the Labor Act provides, in relevant part, as follows:

     "If a hearing is necessary to resolve any issues of representation under this Section, the Board shall conclude its hearing process and issue a certification of the entire appropriate unit not later than 120 days after the date the petition was filed. The 120-day period may

be extended one or more times by the agreement of all parties to a hearing to a date certain." 5 ILCS 315/9(a-5) (West 2010).

¶ 61    In support of its contention section 9(a-5) is mandatory, the Secretary points to the Labor Act's language the Board "shall" act within 120 days. Our supreme court has clarified, however, "the word 'shall' is not determinative" in determining whether a statute is mandatory or directory. *Robinson*, 217 Ill. 2d at 54, 838 N.E.2d at 936. Rather, we determine whether a statutory command is mandatory or directory by ascertaining the legislative intent behind the statute. *Id.*

¶ 62    We presume a statute issuing a procedural command to a government official is directory. *People v. Delvillar*, 235 Ill. 2d 507, 517, 922 N.E.2d 330, 336 (2009). This presumption may be overcome, however, when either (1) the statute contains negative language prohibiting further action in the case of noncompliance, or (2) the right the statute is designed to protect would be injured under a directory reading. *Id.*

¶ 63    The Secretary contends the second condition is met here. Namely, the Secretary posits one of the Labor Act's purposes is to "prescribe the legitimate rights of both public employees and public employers." 5 ILCS 315/2 (West 2010). According to the Secretary, the Board's failure to resolve a case within 120 days would result in a change in the workforce and thus prejudice (1) employers' rights to have a majority of their current employees in favor of unionization, and (2) employees' rights to choose whether they become members of a bargaining unit.

¶ 64    We find the Secretary's argument unpersuasive. In *County of Du Page v. Illinois Labor Relations Board*, 231 Ill. 2d 593, 607, 900 N.E.2d 1095, 1103 (2008), the supreme court reviewed the legislative history of section 9(a-5) and determined the legislature's intent in enacting the statute was "to provide an alternative to the 'lengthy and cumbersome' statutory election procedure." In 2009, Public Act 96-813 (Pub. Act 96-813, § 5 (eff. Oct. 30, 2009)) amended section 9(a-5) to add, among other things, the 120-day time period to resolve majority interest petitions. The bill's sponsor, Representative Linda Chapa LaVia, explained the bill's amendments would protect employees from having "their interests unfairly compromised by the tremendous delays in the process of the cases." 96th Ill. Gen. Assem., House Proceedings, Apr. 2, 2009, at 76 (statements of Representative Chapa LaVia).

¶ 65    The foregoing review of the legislative history behind section 9(a-5) leads us to conclude finding the statute is mandatory would, in fact, injure the rights the Labor Act was designed to protect. If the 120-day deadline set forth in section 9(a-5) were mandatory, each time the deadline passed, the Union would be required to file a new petition and reinitiate the entire petition process, thereby causing substantial delays.

¶ 66    Based on the foregoing, we conclude section 9(a-5) is discretionary. Therefore, the Board retained jurisdiction to address the Union's petition.

¶ 67        D. The Secretary's Assertion the Executives Are "Supervisors"

¶ 68    The Secretary next contends the Board's decision he failed to prove the Executives were supervisors within the meaning of the Labor Act was clearly erroneous. We disagree.

¶ 69     The Labor Act prohibits a bargaining unit from including both employees and supervisors. 5 ILCS 315/3(s)(1) (West 2010). This prohibition "ensures employers that pro-union bias will not impair the supervisor's ability to apply the employer's policies to subordinates according to the employer's best interests." *City of Freeport v. Illinois State Labor Relations Board*, 135 Ill. 2d 499, 506, 554 N.E.2d 155, 159 (1990). Section 3(r) defines a " '[s]upervisor' " as follows:

> " 'Supervisor' is an employee whose principal work is substantially different from that of his or her subordinates and who has authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, direct, reward, or discipline employees, to adjust their grievances, or to effectively recommend any of those actions, if the exercise of that authority is not of a merely routine or clerical nature, but requires the consistent use of independent judgment. Except with respect to police employment, the term 'supervisor' includes only those individuals who devote a preponderance of their employment time to exercising that authority, State supervisors notwithstanding." 5 ILCS 315/3(r) (West 2010).

¶ 70     Thus, employees are supervisors pursuant to the Labor Act if they (1) perform principal work that is substantially different from that of their subordinates; (2) have authority in the interest of the employer to perform some or all of the 11 enumerated supervisory functions; (3) consistently use independent judgment in performing the enumerated functions; and (4) devote a preponderance of their time to performing those functions. *Chief Judge of the Circuit Court v. American Federation of State, County & Municipal Employees, Council 31*, 153 Ill. 2d 508, 515, 607 N.E.2d 182, 186 (1992). As the party seeking to exclude the Executives from the bargaining unit, the Secretary carried the burden of proving, by a preponderance of the evidence, the Executives were "supervisors" within the meaning of the Labor Act. See *Department of Central Management Services (State Police)*, 382 Ill. App. 3d at 220-21, 888 N.E.2d at 575.

¶ 71     Here, the Board found the Secretary failed to prove the Executives spend a preponderance of their time using independent judgment to perform the tasks enumerated in section 3(r) of the Labor Act. Specifically, the Board found the Executives exercise independent judgment only when they (1) reward, (2) discipline, and (3) discharge probationary employees–tasks the Executives do not spend a preponderance of their time completing. The Secretary asserts the Board's decision was clearly erroneous because (1) the Executives also exercise independent judgment when directing their subordinates, and (2) the Executives devote a preponderance of their time to performing supervisory functions. We address the Secretary's assertions in turn.

¶ 72                    1. *Whether the Executives Use Independent Judgment*
                          *To "Direct" Their Subordinates*

¶ 73     The Secretary first posits the Board's finding the Executives do not exercise independent judgment when directing their subordinates was clearly erroneous. We disagree.

¶ 74     The statutory term "direct" encompasses related oversight functions such as reviewing and monitoring work activities, instructing on how work is to be performed, scheduling work

hours, approving time-off and overtime requests, assigning duties, and evaluating job performance. *Department of Central Management Services (State Police)*, 382 Ill. App. 3d at 224, 888 N.E.2d at 578. Exercising "independent judgment" means " 'the alleged supervisor must make choices between two or more significant courses of action without substantial review by superiors.' " *Chief Judge*, 153 Ill. 2d at 516, 607 N.E.2d at 186. Some supervisory functions "are routine or ministerial in nature and do not generally require the use of independent judgment." *City of Freeport*, 135 Ill. 2d at 521, 554 N.E.2d at 166.

¶ 75    Here, the Secretary contends he proved the Executives" direct" their subordinates by presenting evidence showing the Executives (1) are responsible for the overall direction of their facilities, (2) assign work to their subordinates, (3) complete performance evaluations of their subordinates, and (4) approve and disapprove time-off requests.

¶ 76                    a. The Executives' Overall Direction of Their Facilities

¶ 77    The Secretary asserts the Executives generally manage the overall direction of their facilities. In support of his assertion, the Secretary cites the following evidence: (1) organizational charts showing the executive IIs are usually the top employees at their facilities and the executive Is are usually "second in command"; (2) Lazzerini's "undisputed" testimony the Executives "run[ ] the show" and manage the "overall direction" of their facilities, and (3) three Executives' job descriptions and five other documents detailed below.

¶ 78    First, the Secretary contends the Executives' status as the top or second top employee at their facilities is sufficient, in and of itself, to show the Executives direct their subordinates. In support of his contention, the Secretary cites *City of Sandwich v. Illinois Labor Relations Board, State Panel*, 406 Ill. App. 3d 1006, 942 N.E.2d 675 (2011), in which the Second District held the petitioned-for police sergeants were "supervisors" within the meaning of the Labor Act. In reaching its holding, the Second District noted when the chief of the police department was absent–which was a majority of the time–the on-duty sergeant was the highest-ranked employee at the headquarters for the police department. The court stated "[i]t is unrealistic to conclude that patrol officers are unsupervised two-thirds to almost three-quarters of the time." *City of Sandwich*, 406 Ill. App. 3d at 1012, 942 N.E.2d at 681.

¶ 79    As the Board points out, however, *City of Sandwich* is inapposite because there, the on-duty sergeant was the highest-ranked employee at the headquarters for the entire police department. By contrast, here, the Executives are the highest-ranked on-site employees at their *facilities*, but they are not the highest-ranked employees in the entire department. Lazzerini testified, in the Driver Services department, Executives rank below directors, deputy directors, administrators, and zone managers.

¶ 80    Moreover, in *City of Sandwich*, the Second District did not rely solely on the fact that the petitioned-for sergeants were the highest-ranked active employee for the police department. The court also noted (1) the city ordinance and department policies clearly demonstrated the city's plan to utilize sergeants as supervisors, and (2) the sergeants were required to investigate, report, and recommend discipline.

¶ 81    Finally, we note our court rejected a similar argument in *County of Vermilion v. Illinois Labor Relations Board*, 344 Ill. App. 3d 1126, 800 N.E.2d 875 (2003). There, the employer

had asserted that, because the police sergeants were often the only on-duty employees in a supervising capacity, they must necessarily be spending a preponderance of their time engaged in supervision. *County of Vermilion*, 344 Ill. App. 3d at 1136, 800 N.E.2d at 882. We disagreed that such a conclusion could be made "where, as here, deciding whether a person is a 'supervisor' must be made in accordance with the particular legislative formula set forth in section 3(r) of the [Labor] Act." *Id.*

¶ 82　For the foregoing reasons, we reject the Secretary's contention the Executives' status as the top or second in command at their facilities necessarily showed the Executives spend a preponderance of their time supervising their subordinates.

¶ 83　The Secretary also asserts Lazzerini's "undisputed testimony" sufficiently proved the Executives direct their employees. Lazzerini stated the Executives' primary duty "is to direct, manage, and supervise the employees of the facilit[ies]." He also said the Executives "run[ ] the show" and manage the "overall direction" of the facilities. However, the Board concluded Lazzerini's testimony was too conclusory to meet the Secretary's burden of proof. The Board's decision in that regard is not clearly erroneous.

¶ 84　Finally, the Secretary's brief states "[Lazzerini's] testimony is supported by the stipulated exhibits and surveys, which contain job descriptions and other work documents," and provides an accompanying footnote directing us to see three documents in the record as "examples of Executive[s]' job descriptions" and five documents in the record as "examples of Executives' direction of subordinates."

¶ 85　The three job descriptions cited by the Secretary are those of Matthew Adduci, Joseph Boggs, and Brenda Bostic, all executive Is.

¶ 86　Matthew Adduci's position description states he spends 30% of his time "plan[ning], organiz[ing], direct[ing], supervis[ing] and evaluat[ing] staff"; "supervis[ing] staff within established policies; exercis[ing] responsibility for assignment of daily work tasks; recommend[ing] personnel actions affecting subordinate[s]" and "approv[ing] employee time off." He spends 20% of his time determining, establishing, and implementing operational procedures to address workflow, 20% of his time participating in policy and procedure development, 10% performing driver services duties, 10% preparing reports "pertaining to day-to-day operations," and 10% performing other duties.

¶ 87　Joseph Boggs' position description says he spends 35% of his time "plan[ning], organiz[ing], direct[ing], and evaluat[ing] the activities of his employees and responding to their inquiries, 25% of his time "ensuring adequate" staffing levels, developing training programs, and conferring with the administrator to develop and implement work procedures. Boggs also spends 15% of his time maintaining and monitoring production reports and reviewing and recommending to the administrator "areas for policy/procedural revisions for improved efficiency." Boggs spends the other 25% of his time responding to public inquiries, initiating progressive disciplinary actions, approving scheduled time off for staff, and performing other duties.

¶ 88　Brenda Bostic's position description says Bostic spends 40% of her time "[p]lan[ning], supervis[ing]" and "evaluat[ing] staff," administering progressive discipline, arranging for employees' training, determining work schedules and time-off requests, assigning overtime

and travel assignments, and handling employee work complaints. She devotes 20% of her time to maintaining records of money collected by the facility, 20% of her time administering road examinations and performing cashier functions, and the remaining 20% of her time completing other duties.

¶ 89    The Board, in a footnote in its decision, found the job descriptions cited by the Secretary "suffer from the same defect as much of the testimony. In conclusory terms, they provide that the Executive Is and IIs 'direct' their subordinates." *Service Employees International Union, Local 73*, 28 PERI ¶ 68, at 306 n.7 (ILRB State Panel 2011). We agree with the Board in this regard. The job descriptions do not specify–nor does the Secretary's brief explain–the extent to which the Executives use independent judgment to complete the tasks outlined in their job descriptions. Instead, the descriptions contain generalized statements, such as the Executives plan, direct, supervise and evaluate. Based on these generalized statements, the Board could reasonably conclude the Secretary failed to carry his burden of proving the Executives act in a supervisory role when directing their employees. See *Department of Central Management Services (State Police)*, 382 Ill. App. 3d at 228, 888 N.E.2d at 581 (concluding the Board could reasonably find, despite broad language in the employees' job description, the employees do not, in practice, have significant discretionary authority to affect their subordinates' employment).

¶ 90    The Secretary also cites five documents as supportive of Lazzerini's testimony the Executives' "primary function is to direct, manage, and supervise the employees of the facility." The first of these documents is a handout prepared by Christine Works, an executive I, for a January 2010 staff meeting. The handout instructs employees on matters such as communicating via email and setting task reminders on their computers. The handout also details how work will be divided among available employees when an employee is unavailable. The handout further instructs employees on confidentiality, time-off, and call-in policies, providing a link to the policy manual.

¶ 91    The second document the Secretary directs us to consider is a document prepared by Loretta Cass, an executive II, which the Secretary says shows Cass' "[p]raise of [a] subordinate" and "direction of work." The document contains various reminders to employees about processing forms as well as policies relating to cellular phone usage and beverage consumption during work.

¶ 92    The third document the Secretary cites as an example of the Executives' direction of subordinates is a March 2010 email from Denise Westnedge, an executive II, to her employees. The email contains the subject line "Office policies 2010" and contains instructions to subordinates regarding (1) office hours, (2) cellular phone usage, (3) breaks, (4) talking to other coworkers, (5) email usage, (6) receiving visitors from other departments, and (7) requests for time off and switching break times.

¶ 93    The Secretary's fourth cited example of Executives' direction is a performance evaluation of Marsha Dirks, an executive I, completed by her supervisor, an executive IV. Dirks' supervisor's comments indicate he meets with Dirks monthly, at which time Dirks "will present problematic situations that need administrative review or action." The comments also say Dirks "is challenged by new ideas or interpretaions [*sic*] of policies and

is one that presents different perspectives to assist in solutions." The evaluation also contains "goals" for Dirks' next reporting period, including the following: (1) initiate necessary disciplinary actions, (2) provide evaluations of all employees, (3) keep employees informed of all procedural, policy, and/or legislative changes, (4) continue to supervise and review the activities of employees, "reporting any problems immediately to Administrator," (5) "[a]nalyze workloads of employees to maintain maximum productivity and efficiency throughout the facility and recommend any improvements to workflow and procedures in the vehicle area," and (6) identify any needed training issues and bring them to the administrator.

¶ 94    The Secretary's final cited example of Executives' direction is a one-page document entitled "Goals-Public Inquiry Division." The document appears to have been attached to a performance evaluation completed by Danny Neff, an executive I. The document contains advice to employees on being courteous, dealing with angry callers, and avoiding bad habits such as "chewing while talking" and "holding two conversations at the same time."

¶ 95    None of the aforementioned documents leave us with the "definite and firm conviction" the Board committed an error by concluding the Executives do not exercise supervisory authority when directing their subordinates. *American Federation of State, County & Municipal Employees*, 216 Ill. 2d at 577-78, 839 N.E.2d at 485. The Secretary's bald citation to these documents–without any argument or explanation as to how, specifically, the documents show the Executives using independent judgment–fails to convince us the Board's findings were erroneous.

¶ 96                              b. Assigning Work

¶ 97    The Secretary next claims the Executives "direct" their subordinates when they assign work. In support of his claim, the Secretary cites the following documents: (1) an email from Grant Lakin, an executive I, directing employees to give "coded mail" to one of the employees; (2) a handout prepared by Christine Works, an executive I, directing employees on various tasks such as checking email and using computer programs; and (3) an email from Thomas Kovalichuk, an executive I, in which he tells another employee (presumably his supervisor) he assigned a subordinate to complete an assignment ("the Bizflows") each day before "going to VIA." The Secretary also points out Lazzerini testified that "based upon operational needs, management will assign staff to those various locations in order to ensure that the facility is running properly."

¶ 98    The Board found Lazzerini's testimony merely showed the Executives "instruct their subordinates to perform the duties as outlined in their job descriptions and as needed to address the flow of work at the facility. That sort of instruction does not involve the use of independent judgment by the supervisor." The Board's finding was not clearly erroneous. See *City of Freeport*, 135 Ill. 2d at 531, 554 N.E.2d at 170 (concluding Board did not clearly err by finding that lieutenants do not use independent judgment when directing firefighters because tasks are assigned according to agreed-upon system and standards set forth in fire chief's manual).

¶ 99    Like Lazzerini's testimony, the Secretary's citation to the documents–again, without any argument or explanation as to what, specifically, the documents show–does not convince us

the Board erred. The documents merely show the Executives assigning tasks in a routine fashion to manage workloads and do not convince us the Board's findings were clearly erroneous. See *Chief Judge*, 153 Ill. 2d at 521-22, 607 N.E.2d at 188-89 (quoting with approval the appellate court's finding the supervisors' assignment of work on a *pro rata* basis is a routine function not requiring the exercise of independent judgment).

¶ 100                              c. Completing Performance Evaluations

¶ 101    Next, the Secretary argues the Executives direct their employees through performance evaluations. Specifically, the Secretary asserts the evaluations "evidence the authority and exercise of that authority to direct as they can impact the terms of their subordinates' employment through salary adjustments and opportunities for advances."

¶ 102    The Secretary raised an identical argument in his exceptions to the ALJ's findings, contending "the evaluations" contained "a myriad of examples of direction." In rejecting the Secretary's argument, the Board, in its order, responded as follows: "[T]he ALJ found the Executive Is and IIs reward, discharge, and discipline subordinates ***, findings to which the evaluations *** would no doubt be most relevant, but the evidence demonstrates that performance of those tasks, without more, cannot meet the preponderance of time element."

¶ 103    Whether we consider the evaluations in the context of showing Executives' "reward, discharge, and discipline" of subordinates or view the evaluations as showing Executives' "direction" of subordinates, the evaluations are insufficient to convince us the Board erred because the Secretary has not shown the Executives spend a substantial amount of their time completing the evaluations. Indeed, Lazzerini testified the Executives evaluate probationary employees twice a year and evaluate nonprobationary employees once a year.

¶ 104                          d. Approving and Disapproving Time-Off Requests

¶ 105    Finally, the Secretary claims the Executives direct their employees by approving and disapproving time-off requests. Citing Lazzerini's testimony, the Secretary contends the evidence shows the following: (1) the Executives have the authority based on operational needs to grant or deny time off outside of the contract's parameters, and (2) the Executives independently determine whether overtime, which does not need to be preapproved by a regional manager, is needed.

¶ 106    Lazzerini testified Executives generally approve time-off requests based on (1) seniority, (2) operational needs, and (3) contract requirements. Lazzerini also stated Executives can deny time off, even when requisite staffing levels are met. However, on cross-examination, the Union's attorney asked Lazzerini whether the Executives, in fact, ever deny time off when staffing levels are met, and the following colloquy ensued:

"[LAZZERINI]: Yeah. I'm not there every day. I would imagine they do or else the vacation time would just be rubber stamped. And I know there's been vacation denied.

[UNION ATTORNEY]: Based on staffing needs, correct?

[LAZZERINI]: Correct.

[UNION ATTORNEY]: Okay but what I'm talking about is if the staffing needs are

-16-

met, they don't deny time off, right?

    [LAZZERINI]: You know, I'm not there every day. I don't know every denial of vacation time.

    [UNION ATTORNEY]: So you don't know?

    [LAZZERINI]: I don't know."

¶ 107    The automatic approval of vacation and sick leave requests does not require the consistent use of independent judgment. *Chief Judge*, 153 Ill. 2d at 518, 607 N.E.2d at 187. Lazzerini's testimony revealed that he did not actually know whether Executives deny vacation time when staffing levels are met; thus, the testimony fails to establish by a preponderance of the evidence the Executives' approval or denial of vacation time was *not* automatic. Likewise, Lazzerini's cursory testimony the Executives "make the call" with respect to scheduling overtime–without any evidence as to how often overtime is, in fact, considered or assigned–is insufficient to convince us the Board erred by concluding the Executives do not exercise independent judgment with respect to scheduling.

¶ 108    *2. Whether the Executives Devote a Preponderance of Their Time*
*To Performing Supervisory Functions*

¶ 109    The Secretary next claims the Board erred by concluding the Executives do not spend a preponderance of their time performing supervisory functions. Specifically, the Secretary contends (1) the preponderance test should not apply to state employees, and (2) the evidence shows the Executives are engaged predominantly in supervisory functions. We disagree.

¶ 110    Section 3(r) of the Labor Act provides "the term 'supervisor' includes only those individuals who devote a preponderance of their employment time to exercising that authority, State supervisors notwithstanding." 5 ILCS 315/3(r) (West 2010). The term "preponderance" means that "the employee must spend more time on supervisory functions than on any one nonsupervisory function." *City of Freeport*, 135 Ill. 2d at 532, 554 N.E.2d at 171. Our court has rejected the use of a strictly mathematical approach to determine whether the "preponderance of time" component is met. *Department of Central Management Services v. Illinois State Labor Relations Board*, 278 Ill. App. 3d 79, 86, 662 N.E.2d 131, 136 (1996). Rather, we noted " '[p]reponderance' " can mean superiority in numbers or superiority in importance. *Department of Central Management Services*, 278 Ill. App. 3d at 86, 662 N.E.2d at 136.

¶ 111    In *Department of Central Management Services v. Illinois State Labor Relations Board*, 249 Ill. App. 3d 740, 745, 619 N.E.2d 239, 243 (1993), this court concluded the " 'preponderance requirement' " applies to state employees. The Secretary urges us to reconsider that decision. We see no reason to do so. As we noted in *Department of Central Management Services*, the plain and ordinary meaning of the word "notwithstanding" clearly does not exempt state supervisors from the "preponderance" requirement. (Internal quotation marks omitted.) *Department of Central Management Services*, 249 Ill. App. 3d at 745, 619 N.E.2d at 243.

¶ 112    Thus, we turn to whether the Board erred by concluding the Executives do not spend a

preponderance of their time acting in a supervisory function. In reaching its conclusion, the Board reasoned the Executives only exercise independent judgment when rewarding, disciplining, and discharging employees, and the Secretary failed to show the Executives spend a preponderance of their time in these functions. On appeal, the Secretary, referencing Lazzerini's testimony and a string cite of documentary evidence, contends the Board clearly erred. We disagree.

¶ 113　Lazzerini testified, based on "being in the facility hundreds of times and spending weeks at a time in a facility" and "conversations" with others, the Executives spend 75% of their time "directing" their subordinates. As we have already explained, however, the Board's conclusion the Executives do not exercise independent judgment when directing employees is supported by the evidence. Thus, Lazzerini's testimony concerning the amount of time the Executives spend "directing" does not provide any detail with respect to the amount of time the Executives spend engaged in supervisory functions or the significance of these functions.

¶ 114　The documentary evidence cited by the Secretary also does not convince us the Board clearly erred. The cited exhibits may demonstrate the Executives rewarding, disciplining, and discharging their subordinates, but they do not show much *time* the Executives spend on these functions or that these functions are more important than the Executives' other nonsupervisory tasks. For example, the documents the Secretary cites as "examples of discipline" consist of disciplinary notices to subordinates and memorandum documenting Executives' counseling of subordinates with regard to policy violations. None of these exhibits provide any detail about how much time the Executives spend disciplining; they merely serve to show the Executives do, in fact, discipline their subordinates.

¶ 115　The Secretary also relies on the Executives' job descriptions. However, as previously explained, these descriptions contain generalized statements which the Board could reasonably conclude were insufficient to meet the Secretary's burden of proof. Moreover, to the extent these descriptions detail the amount of time the Executives spend on the supervisory functions of rewarding, disciplining, and discharging subordinates, the descriptions do not support the Secretary's contention the Executives devote a preponderance of their time to executing these functions. As the Board points out, the cited job descriptions estimate the Executives spend approximately 10% of their time on a consolidated description of activities, which includes evaluating or disciplining.

¶ 116　For the foregoing reasons, we conclude the Board did not clearly err by finding the Executives do not spend a preponderance of their time engaged in supervisory functions.

¶ 117　E. The Secretary's Claim He Proved the Executives
Are Managers Under the Labor Act

¶ 118　Finally, the Secretary asserts the Board clearly erred by concluding the Executives were not managers under the Labor Act (5 ILCS 315/3(j) (West 2010)). Section 3(j) of the Labor Act defines a " '[m]anagerial employee' " as "an individual who is engaged predominantly in executive and management functions and is charged with the responsibility of directing the effectuation of management policies and practices." 5 ILCS 315/3(j) (West 2010).

¶ 119　The Illinois Appellate Court has applied two tests to determine whether an employee is

managerial: (1) the traditional test, which considers whether the employee is a managerial employee as a matter of fact, and (2) the alternative test, which considers whether the employee is a managerial employee as a matter of law. *Department of Central Management Services/The Department of Healthcare & Family Services v. Illinois Labor Relations Board, State Panel*, 388 Ill. App. 3d 319, 330, 902 N.E.2d 1122, 1130 (2009). Because the Secretary stipulated during hearing he was only advancing the "matter of fact" test, we will not address any of the Secretary's arguments on appeal pertaining to the "matter of law" test. See *Bloom Township High School District 206 v. Illinois Educational Labor Relations Board*, 312 Ill. App. 3d 943, 952, 728 N.E.2d 612, 620 (2000) ("[A]rguments or objections not raised during administrative proceedings are deemed waived and cannot be asserted for the first time on judicial review.").

¶ 120                                    1. *The Traditional Test*

¶ 121      To demonstrate a petitioned-for employee is managerial under the traditional test, the employer must show the employee is (1) engaged predominantly in executive and management functions and (2) charged with the responsibility of directing the effectuation of management policies and practices. *Department of Central Management Services/The Department of Healthcare & Family Services*, 388 Ill. App. 3d at 330, 902 N.E.2d at 1130.

¶ 122      With respect to the first element, the Board has defined "management functions" as functions that "amount to running an agency or department" such as "establishing policies and procedures, preparing the budget, or otherwise assuring that the agency or department operates effectively." (Internal quotation marks omitted.) *Department of Central Management Services/Illinois Commerce Comm'n v. Illinois Labor Relations Board, State Panel*, 406 Ill. App. 3d 766, 774, 943 N.E.2d 1136, 1143 (2010). Other management functions include using independent discretion to make policy decisions, changing the focus of an employer's organization, being responsible for day-to-day operations, and negotiating on behalf of an employer with its employees or the public. *Department of Central Management Services/The Department of Healthcare & Family Services*, 388 Ill. App. 3d at 330, 902 N.E.2d at 1130. An employee is not a managerial employee if he or she serves merely as a subordinate or advisory function in the development of policy because " 'it is the final responsibility and independent authority to establish and effectuate policy that determines managerial status under the [Labor] Act.' [Citation.]" *Department of Central Management Services/The Department of Healthcare & Family Services*, 388 Ill. App. 3d at 331, 902 N.E.2d at 1130.

¶ 123      The second part of the definition "emphasizes that a managerial employee's authority extends beyond the realm of theorizing and into the realm of practice." *Department of Central Management Services/Illinois Commerce Comm'n*, 406 Ill. App. 3d at 774, 943 N.E.2d at 1144. Thus, managerial employees do not merely recommend policies that a superior is equally likely to take or leave; instead, they make effective recommendations. *Department of Central Management Services/Illinois Commerce Comm'n*, 406 Ill. App. 3d at 775, 943 N.E.2d at 1144. "[E]ffective recommendations" are those recommendations that are accepted almost all of the time. (Internal quotation marks omitted.) *Department of*

*Central Management Services/Illinois Commerce Comm'n*, 406 Ill. App. 3d at 776-77, 943 N.E.2d at 1145. A managerial employee does not merely perform duties essential to the employer's ability to accomplish its mission. *Department of Central Management Services/The Department of Healthcare & Family Services*, 388 Ill. App. 3d at 331, 902 N.E.2d at 1131. Rather, the employee must possess the authority or responsibility to determine the specific methods or means of how the employer's services will be provided. *Id.*

¶ 124                                  2. *The Board's Findings*

¶ 125     Here, the Board concluded the Secretary failed to establish either prong of the managerial test. Specifically, the Board rejected the Secretary's argument that, based on this court's holding in *Department of Central Management Services/The Department of Healthcare & Family Services*, 388 Ill. App. 3d at 330, 902 N.E.2d at 1130, managerial employees need not meet the first prong of the managerial test. To the contrary, the Board reiterated the Secretary needed to establish both prongs of the test. The Board further found the Secretary failed to establish the second prong because the record did not establish the Executives " 'develop[ ] means and methods of achieving policy objectives, determine[ ] the extent to which the objectives will be achieved, and [are] empowered with a substantial amount of discretion to determine how policies will be effected' " (quoting *Department of Central Management Services/The Department of Healthcare & Family Services*, 388 Ill. App. 3d at 331, 902 N.E.2d at 1131).

¶ 126     The Board also rejected the Secretary's argument the Executives who are the highest-ranking employees at their particular facilities "run the show" and are therefore managerial. The Board reasoned the Secretary's evidence did not show the Executives make managerial decisions to provide services in a unique way at their respective facilities; rather, the evidence revealed each facility performs the same tasks in the same manner.

¶ 127                             3. *The Secretary's Claims on Appeal*

¶ 128     On appeal, the Secretary claims the Board's denial of management status to the Executives was clearly erroneous. First, the Secretary quotes this court's statement in *Department of Central Management Services/Illinois Commerce Comm'n*, 406 Ill. App. 3d at 780, 943 N.E.2d at 1148, that "[r]unning the department might or might not entail the creation of new policies, but it will always entail 'directing the effectuation' of existing policies. [Citation.]" Based on this, the Secretary claims it established both prongs of the two-part test because "the undisputed evidence" shows the Executives "run their locations and facilities by independently directing, rewarding, disciplining, and discharging their subordinates and implementing and effectuating the Secretary of State's procedures and policies." In support of his claim, the Secretary provides a lengthy string citation to (1) portions of Lazzerini's testimony, (2) the Executives' job descriptions, (3) performance evaluations completed by the Executives, (4) documents allegedly showing "examples of Executives' direction of subordinates," and (5) documents purporting to demonstrate "examples of discipline." Again, the Secretary does not offer any explanation as to how the

string-cited evidence connects to the controlling law.

¶ 129    Our statement in *Department of Central Management Services/Illinois Commerce Comm'n* does not lend support for the Secretary's contention the Executives at issue here are managers, nor does our review of the cited evidence convince us the Board clearly erred by concluding on this hearing evidence the Executives were not managers. We made our statement in *Department of Central Management Services/Illinois Commerce Comm'n* in the context of envisioning a scenario in which the highest-ranked official of an agency, the director, could determine existing regulations and procedures were adequate and thus see no need to create any new policies. *Department of Central Management Services/Illinois Commerce Comm'n*, 406 Ill. App. 3d at 780, 943 N.E.2d at 1148. However, we reasoned "it would be absurd to deny that such a director is a managerial employee, because, as the highest-ranking employee, this director has the responsibility of running the department." *Id.* We noted "[r]unning the department" will "always entail 'directing the effectuation' of existing policies." *Id.*

¶ 130    While some of the Executives at issue are the top employee at their facilities, they do not "run" those facilities like the director we envisioned in *Department of Central Management Services/Illinois Commerce Comm'n*, who, by virtue of his status as the top-ranked official in an entire agency, would necessarily have the authority to perform the other "management functions" that "amount to running an agency or department" such as "establishing policies and procedures, preparing the budget, or otherwise assuring that the agency or department operates effectively." *Department of Central Management Services/Illinois Commerce Comm'n*, 406 Ill. App. 3d at 774, 943 N.E.2d at 1143.

¶ 131    By contrast, here the Secretary presented no evidence the Executives serve anything other than a subordinate or advisory function. See *Department of Central Management Services/The Department of Healthcare & Family Services*, 388 Ill. App. 3d at 331, 902 N.E.2d at 1130. The Secretary's documentary evidence demonstrates the Executives completing such tasks as documenting subordinates' policy violations, reminding subordinates about break and computer usage policies, and completing performance evaluations of their subordinates. To show the Executives were managers, however, the Secretary needed to provide evidence of them doing more than merely performing "duties essential to the employer's ability to accomplish its mission." (Internal quotation marks omitted.) See *Department of Central Management Services/The Department of Healthcare & Family Services*, 388 Ill. App. 3d at 331, 902 N.E.2d at 1131.

¶ 132    Likewise, the Secretary has failed to establish the Executives direct the effectuation of the Secretary of State's policies. In *Department of Central Management Services/Illinois Commerce Comm'n*, 406 Ill. App. 3d at 775, 943 N.E.2d at 1144, we explained an individual "directs the effectuation of management policies and practices if he or she 'oversees or coordinates policy implementation through development of means and methods of achieving policy objectives, determines the extent to which the objectives will be achieved, and is empowered with a substantial amount of discretion to determine how policies will be effected.' *Department of Central Management Services v. Illinois State Labor Relations Board*, 278 Ill. App. 3d 79, 87, 662 N.E.2d 131, 137 (1996) ***." Here, Lazzerini testified the Executives do not formulate policies for the Secretary of State, nor do they have the

-21-

authority to decide not to enforce a policy unless a safety emergency exists. Thus, the Secretary failed to establish the Executives direct the effectuation of the Secretary of State's policies.

¶ 133　Based on the evidence presented, the Board could reasonably conclude the Executives were not managers under the traditional test.

¶ 134　In its brief, the Secretary also references an "implied managerial exclusion," contending under the Labor Act, petitioned-for employees are deemed managers when they are aligned with management such that allowing them to join a bargaining unit would create a division of loyalty between their employee and the Union. Illinois courts have expressed concern over placing employees in a bargaining unit requiring the employees to divide their loyalty between the unit and their employer. See *Salaried Employees of North America (SENA) v. Illinois Local Labor Relations Board*, 202 Ill. App. 3d 1013, 1021, 560 N.E.2d 926, 932 (1990) ("[T]he key inquiry is whether the duties and responsibilities of the employees in question are such that the employees should not be placed in a position requiring them to divide their loyalty between the employer and the bargaining unit.").

¶ 135　However, this concern over a potential conflict of interest is not a test in and of itself for determining whether an employee is "managerial." Rather, the traditional two-pronged test is designed to address this concern by determining whether certification would result in a conflict of interest. See *Village of Elk Grove Village v. Illinois State Labor Relations Board*, 245 Ill. App. 3d 109, 123-24, 613 N.E.2d 311, 320-21 (1993) (rejecting the employer's assertion the court should reverse the Board's decision, even after finding the petitioned-for employees were not supervisors or managers, based on a conflict of interest).

¶ 136　　　　　　　　　　　　III. CONCLUSION

¶ 137　For the reasons stated, we affirm the Board's decision certifying the Union as the Executives' exclusive bargaining representative.

¶ 138　Affirmed.